**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    *Plaintiff*,<br><br>        v.<br><br>KEISHAWN DONALD, TREVON<br>WRIGHT, ERIC HAYES and<br>TRAVON JONES,<br>    *Defendants*. | No. 3:21-cr-8 (VAB) |

**RULING AND ORDER ON POST-TRIAL MOTIONS**

Keishawn Donald, Trevon Wright, Eric Hayes, and Travon Jones (collectively, the

"Defendants")[1] were charged in a single-count Superseding Indictment with crimes related to the

possession and distribution of narcotics, robberies, and acts of violence, including murders and

assaults. *See* Second Superseding Indictment, ECF No. 412 (Sept. 7, 2023) ("Second

Superseding Indictment").

After sixteen days of the Government presenting its case-in-chief, each of the Defendants

orally moved for acquittal. *See* Min. Entry, ECF No. 555 (Nov. 29, 2023).

Each Defendant subsequently filed a motion for judgment of acquittal and/or a motion for

a new trial. *See* ECF Nos. 556, 584, 590–92, 598–99.

For the following reasons, the Court **DENIES** Defendants' motions for a new trial and

also **DENIES** the motions for acquittal.

---

[1] Four other individuals, Kyran Dangerfield, Tyrone Moore, Charles Anthony Bonilla, and Harry Batchelor, were originally charged but have since pled guilty. *See* Plea Agreement, ECF No. 184 (Nov. 15, 2021) (Kyran Dangerfield); Plea Agreement, ECF No. 239 (July 5, 2022) (Tyrone Moore); Plea Agreement, ECF No. 137 (June 24, 2021) (Charles Anthony Bonilla); Plea Agreement, ECF No. 356 (June 5, 2023) (Harry Batchelor).

# I.    FACTUAL AND PROCEDURAL BACKGROUND

## A.    Pre-Trial Case History

### a.    Keishawn Donald

On January 19, 2021, a grand jury returned an indictment charging Mr. Donald with Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d). *See* Indictment, ECF No. 11.

On February 11, 2021, Mr. Donald appeared for an arraignment before U.S. Magistrate Judge William I. Garfinkel. Min. Entry, ECF No. 33. He pled not guilty and the Court ordered that he be detained. *Id.*; Order of Detention, ECF No. 34.

On May 3, 2021, a grand jury returned a Superseding Indictment charging Mr. Donald with the same single Count but adding additional Overt Acts and Special Sentencing Factors. Sealed Superseding Indictment, ECF No. 52.

On May 26, 2021, Mr. Donald appeared for an arraignment before U.S. Magistrate Judge Thomas O. Farrish. *See* Min. Entry, ECF No. 114. He pled not guilty. *Id.*

On September 7, 2023, a grand jury returned a Second Superseding Indictment charging Mr. Donald with the same Count but adding additional information. ECF No. 412.

On September 13, 2023, Mr. Donald appeared for an arraignment before Judge Farrish. *See* Min. Entry, ECF No. 428. He pled not guilty. *Id.*

### b.    Trevon Wright

On January 19, 2021, a grand jury returned an indictment charging Mr. Wright with Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d). *See* Indictment, ECF No. 11.

On January 21, 2021, Mr. Wright appeared for an arraignment before U.S. Magistrate Judge William I. Garfinkel. Min. Entry, ECF No. 19. He pled not guilty, and the Court ordered that he be detained. *Id.*; Order of Detention, ECF No. 22.

On May 3, 2021, a grand jury returned a Superseding Indictment charging Mr. Wright with the same single Count but adding additional Overt Acts and Special Sentencing Factors. Sealed Superseding Indictment, ECF No. 52.

On May 21, 2021, Mr. Wright appeared before Judge Farrish for an arraignment. *See* Min. Entry, ECF No. 110. He pled not guilty. *Id*.

On September 7, 2023, a grand jury returned a Second Superseding Indictment charging Mr. Wright with the same Count but adding additional information. ECF No. 412.

On September 13, 2023, Mr. Wright appeared for an arraignment before Judge Farrish. *See* Min. Entry, ECF No. 429. He pled not guilty. *Id*.

      c.  <u>Eric Hayes</u>

On January 19, 2021, a grand jury returned an indictment charging Mr. Hayes with Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d). *See* Indictment, ECF No. 11.

On March 8, 2021, Mr. Hayes appeared for an arraignment before U.S. Magistrate Judge Holly B. Fitzsimmons. Min. Entry, ECF No. 46. He pled not guilty. *Id.*

On May 3, 2021, a grand jury returned a Superseding Indictment charging Mr. Hayes with the same single Count but adding additional Overt Acts and Special Sentencing Factors. Sealed Superseding Indictment, ECF No. 52.

On May 21, 2021, Mr. Hayes appeared before Judge Farrish for an arraignment. *See* Min. Entry, ECF No. 108. He pled not guilty. *Id*.

On September 7, 2023, a grand jury returned a Second Superseding Indictment charging Mr. Hayes with the same Count but adding additional information. ECF No. 412.

On September 13, 2023, Mr. Hayes appeared for an arraignment before Magistrate Thomas O. Farrish. *See* Min. Entry, ECF No. 430. He pled not guilty. *Id*.

      d.  <u>Travon Jones</u>

On May 3, 2021, a grand jury returned a Superseding Indictment charging Mr. Jones with Racketeering Conspiracy in violation of 18 U.S.C. § 1962(d). Sealed Superseding Indictment, ECF No. 52.

On May 12, 2021, Mr. Jones appeared before Judge Farrish for an arraignment. *See* Min. Entry, ECF No. 82. He pled not guilty, *id.*, and Judge Farrish determined that detention was warranted. Order of Detention, ECF No. 84.

On August 29, 2021, Mr. Jones pled guilty to Count One of the Superseding Indictment. Min. Entry, ECF No. 246; Plea Agreement, ECF No. 247.

On March 9, 2023, Mr. Jones filed a motion to withdraw his guilty plea. Mot. to Withdraw Plea of Guilty, ECF No. 322.

On July 21, 2023, the Court granted Mr. Jones's motion to withdraw his guilty plea. Order, ECF No. 374.

On September 7, 2023, a grand jury returned a Second Superseding Indictment charging Mr. Jones with the same Count but adding additional information. ECF No. 412.

On September 13, 2023, Mr. Jones appeared for an arraignment before Judge Farrish. *See* Min. Entry, ECF No. 431. He pled not guilty. *Id.*


    **B.**    **Trial Proceedings**

Jury selection took place over the course of October 30, 2023 and October 31, 2023. Min. Entry, ECF No. 503 (Oct. 30, 2023); Min. Entry, ECF No. 508 (Oct. 31, 2023). Trial began on November 1, 2023. Min. Entry, ECF No. 509 (Nov. 1, 2023).

The Government presented its case-in-chief over the course of sixteen days. *See* Min. Entry, ECF No. 509 (Nov. 1, 2023); Min. Entry, ECF No. 513 (Nov. 2, 2023); Min. Entry, ECF No. 514 (Nov. 3, 2023); Min Entry, ECF No. 516 (Nov. 6, 2023); Min Entry, ECF No. 525 (Nov. 8, 2023); Min. Entry, ECF No. 529 (Nov. 9, 2023); Min. Entry, ECF No. 530 (Nov. 13, 2023); Min. Entry, ECF No. 531 (Nov. 14, 2023); Min. Entry, ECF No. 537 (Nov. 15, 2023); Min. Entry, ECF No. 548 (Nov. 16, 2023); Min. Entry, ECF No. 549 (Nov. 17, 2023); Min. Entry, ECF No. 550 (Nov. 20, 2023); Min. Entry, ECF No. 551 (Nov. 21, 2023); Min. Entry, ECF No. 553 (Nov. 27, 2023); Min. Entry, ECF No. 554 (Nov. 28, 2023); Min. Entry, ECF No. 555 (Nov. 29, 2023).

On November 29, 2023, the Government rested, and each of the Defendants orally moved for acquittal. *See* Min. Entry, ECF No. 555 (Nov. 29, 2023). Mr. Jones also filed a supplemental memorandum in support of his oral motion. Supp. Mem. in Support of Oral Mot., ECF No. 556 (Nov. 29, 2023).

On November 20, 2023, the Government submitted a memorandum in opposition to Mr. Jones's supplemental memorandum. Opp'n to Supp. Mem. in Support of Oral Mot., ECF No. 564 (Nov. 30, 2023).

On December 13, 2023, Mr. Donald filed a written motion for acquittal and for a new trial. *See* Mot. for J. of Acquittal and Mot. for a New Trial, ECF No. 584. On January 13, 2023, Mr. Donald filed a memorandum of law in support of both motions. *See* Mem. in Support of Mot. for J. of Acquittal and for a New Trial, ECF No. 590 ("Donald Mot.").

 On January 15, 2023, Mr. Hayes filed a written motion for acquittal. *See* Mot. for J. of Acquittal, ECF No. 591 ("Hayes Mot.").

On January 16, 2023, Mr. Wright filed a motion for a new trial. *See* Mot. for a New Trial, ECF No. 592 ("Wright Mot.").

On January 19, 2023, Mr. Jones filed a motion for a new trial and a motion for acquittal. *See* Mot. for Acquittal under Rule 29, ECF No. 598; Mem. in Support of Mot. for Acquittal, ECF No. 598-1 ("Jones Mot. for Acquittal"); Mot. for a New Trial under Rule 33, ECF No. 599; Mem. in Support of Mot. for a New Trial; ECF No. 599-1 ("Jones Mot. for New Trial").

On February 15, 2024, the Government filed a memorandum in opposition to the Defendants' motions for acquittal and motions for a new trial. *See* Mem. in Opp'n, ECF No. 624 ("Gov't Opp'n").

On February 22, 2024, Mr. Wright filed a reply to the Government's response. Reply to Gov't Opp'n to Mot. for a New Trial, ECF No. 628 ("Wright Reply").

On June 28, 2024, Mr. Donald filed a supplemental motion for acquittal and for a new trial. Supp. Mot. for Acquittal and for a New Trial, ECF No. 661 ("Donald Supp. Mot.").

On July 8, 2024, the Government filed a memorandum in opposition to Mr. Donald's motion. Mem. in Opp'n to Keishawn Donald's Supp. Rule 29 and Rule 33 Mot., ECF No. 662. ("Gov't Opp'n to Supp. Mot.").

On July 30, 2024, Mr. Donald filed a reply to the Government's opposition.  Reply to Gov't Opp'n to Mot. to Supp. Rule 29 and Rule 33 Mot, ECF No. 669 ("Donald Supp. Mot. Reply").

## II.    STANDARD OF REVIEW

### A.  Motion for Acquittal

When reviewing a motion for judgment of acquittal, courts must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).

"A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Facen*, 812 F.3d 280, 286 (2d Cir. 2016) (alteration and internal quotation marks omitted) (quoting *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999)). A defendant challenging the sufficiency of the evidence thus "bears a heavy burden." *United States v. Si Lu Tian*, 339 F.3d 143, 150 (2d Cir. 2003) (internal quotation marks omitted).

"[C]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." *United States v. Jackson,* 335 F.3d 170, 180 (2d Cir. 2003). Under this standard, the court "may not usurp the role of the jury by substituting its own determination of the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (quoting *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005)). A court must "defer to the jury[ the] assessment of witness credibility and . . . resolution of conflicting testimony." *United States v. Bala*, 236 F.3d 87, 93–94 (2d Cir. 2000). In sum, "[t]he government's case need not exclude every possible hypothesis of innocence," *United States v. Martinez,* 54 F.3d 1040, 1042–43 (2d Cir. 1995) (internal quotation marks omitted), and where "either of the two results, a reasonable doubt or no

reasonable doubt, is fairly possible, [the court] must let the jury decide the matter," *Guadagna*,
183 F.3d at 129 (internal citation and quotation marks omitted) (alteration in original).

At the same time, the Court is also mindful of its responsibility to protect Defendants'
Fifth Amendment rights. *See, e.g.*, *United States v. Valle*, 807 F.3d 508, 513 (2d Cir. 2015). If
courts "are to be faithful to the constitutional requirement that no person may be convicted
unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our
obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt
beyond a reasonable doubt." *Id.* at 515 (alteration in original) (quoting *United States v. Clark*,
740 F.3d 808, 811 (2d Cir. 2014)). In particular, "specious inferences are not indulged, because it
would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty.
If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal
circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must
necessarily entertain a reasonable doubt." *Id.* (quoting *United States v. Lorenzo*, 534 F.3d 153,
159 (2d Cir. 2008)).

### B. Motion for a New Trial

Federal Rule of Criminal Procedure 33 allows the court to "grant a new trial to [a]
defendant if the interests of justice so require." Fed. R. Crim. P. 33. Under Rule 33, the trial
court has "broad discretion to set aside a jury verdict and order a new trial to avert a perceived
miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). In
deciding such a motion, courts may weigh the evidence and the credibility of witnesses but
cannot "wholly usurp" the role of the jury. *United States v. Autuori*, 212 F.3d 105, 120 (2d Cir.
2000). Accordingly, the power to set aside a jury verdict "should be used 'sparingly' and only 'in

the most extraordinary circumstances.'" *United States v. Zayac*, No. 3:09-cr-00136 (JCH), 2011

WL 5238823, at *2 (D. Conn. Nov. 1, 2011) (quoting *United States v. Ferguson*, 246 F.3d 129,

134 (2d Cir. 2001)).

The court also "must examine the entire case, take into account all facts and

circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134. "The ultimate test

. . . is whether letting a guilty verdict stand would be a manifest injustice." *Id.* To grant the

motion, "[t]here must be a real concern that an innocent person may have been convicted." *Id.*

(internal quotation marks omitted).


## III.    DISCUSSION

After the Government presented its case-in-chief, all four defendants orally moved for

acquittal. ECF No. 555. Mr. Jones, Mr. Donald, and Mr. Hayes subsequently submitted motions

for acquittal under Rule 29.

Mr. Donald has, in the alternative, moved for a new trial under Rule 30, and Mr. Jones

and Mr. Wright have submitted motions for a new trial under Rule 30.

The Court will first address the Defendants' motions for acquittal, and then address their

motions for a new trial.


### A.  Motions for Acquittal

In their written motions for acquittal, Mr. Donald and Mr. Jones argue that the

Government failed to prove that they ratified their participation in the charged conspiracy after

turning eighteen. Mr. Hayes argues that he is entitled to acquittal based on the Government's

alleged failure to identify him in court at trial. In addition, all three Defendants argue that the

evidence as to various aspects of their involvement in the charged racketeering conspiracy was insufficient.

The Court will address each argument in turn.

    1.  <u>Ratification</u>

The Juvenile Delinquency Act (the "JDA") regulates the exercise of federal jurisdiction over juvenile defendants. 18 U.S.C. §§ 5031 *et seq*. The JDA establishes two certification requirements that serve as prerequisites to the exercise of federal jurisdiction over juveniles in federal courts: (1) a "need certification" by the Attorney General that there is a need for the proceeding to occur in federal, as opposed to state, court, and (2) a "record certification" that requires the delivery of any previous juvenile court records to the federal court. *Id.* at § 5032; *U.S. v. Wong*, 40 F.3d 1347, 1363 (2d Cir. 1994) (explaining that "proper certification confers jurisdiction [over juvenile defendants] upon the district court"). The JDA applies to juveniles who are "alleged to have committed an act of juvenile delinquency," which is defined as "the violation of a law of the United States committed by a person prior to his eighteenth birthday which would have been a crime if committed by an adult." 18 U.S.C. §§ 5031–32. In the RICO context, the relevant "act" for purposes of determining jurisdiction under the JDA is the crime charged in the indictment, meaning the substantive RICO and RICO conspiracy offenses, rather than the discrete predicate acts underlying those charges. *Wong*, 40 F.3d at 1365–66.

It is well-established that the JDA does not prevent an adult criminal defendant from being tried as an adult simply because he first became involved in the conspiracy with which he is charged while he was still a minor. *See Wong*, 40 F.3d at 1366; *U.S. v. Geraldo*, 687 F. App'x. 101, 108 (2d Cir. 2017) (summary order); *U.S. v. Cruz*, 805 F.2d 1464, 1477 (11th Cir. 1986). Because conspiracy is a continuing crime, a federal court may assume jurisdiction over a

defendant upon a threshold demonstration of post-eighteen conspiracy activity. *Wong*, 40 F.3d at 1366. In a RICO case, an indictment charging a defendant with only a single predicate act as an adult is sufficient to support a conviction for a substantive RICO or RICO conspiracy violation if there is evidence of a pattern of pre-eighteen predicate acts. *Id.* "[O]nce having established that certain acts of the offense occurred after the defendant's eighteenth birthday, the entire case may be tried in accordance with the adult rules of procedure and evidence." *Id.* at 1367, quoting *Cruz*, 805 F.2d at 1477.

Both Mr. Donald and Mr. Jones argue that they are entitled to a judgment of acquittal because the Government failed to prove that they ratified their participation in the charged conspiracy after turning eighteen. Donald Supp. Mot. at 23–28; Jones Mot. for Acquittal at 3–15. Mr. Jones additionally argues that the charging document in this case was defective because the Government was required to charge a post-eighteen crime, in order to establish jurisdiction. Jones Mot. for Acquittal at 15. Mr. Donald also argues that the jury verdict form was insufficient as a matter of law because it did not include a special interrogatory on the topic of ratification. Donald Supp. Mot. at 1–2.

The Government responds that the JDA does not apply to Mr. Donald or Mr. Jones because the Second Superseding Indictment, the charging instrument in this case, was filed on September 7, 2023, after both defendants turned twenty-one. Gov't Opp'n at 52, 58. It further argues that it introduced ample evidence demonstrating that Mr. Donald and Mr. Jones ratified their involvement in the conspiracy after turning eighteen by continuing their participation in the conspiracy. As to Mr. Donald, the Government emphasizes the evidence of Mr. Donald's involvement in the shooting of Joshua Gilbert, after he turned eighteen. *Id.* at 53–54. As to Mr. Jones, the Government points to the evidence of Mr. Jones's fights in prison with opposition

11

gang members, including his assault of Lorenzo Carter, and the recorded prison calls, in which, it

argues, Mr. Jones indicated that he was still representing the East End gang. *Id.* at 89–60.

Finally, the Government emphasizes that defense counsel for both Mr. Donald and Mr. Jones

argued in closing that they had not ratified their involvement in the conspiracy after turning

eighteen, and the jury was charged on the issue of ratification and provided with the defendants'

birth dates; accordingly, the Government suggests that the jury ultimately correctly found that

both defendants had ratified the conspiracy as adults. *Id.* at 52, 58.

The Court addresses each issue in turn.

### i. *Applicability of the JDA*

The Court does not agree with the Government's argument that the JDA is inapplicable to

this case because the Second Superseding Indictment was filed after the twenty-first birthdays of

each of the defendants. Although the Second Superseding Indictment is the operative charging

instrument in this case and was filed on September 7, 2023, the indictment was filed less than a

month before the commencement of this trial, and more than two years after the initial

indictment in this case, as well as the arrests of each of the defendants. *See* Sealed Indictment,

ECF No. 11 (Jan. 19, 2021); USM Return of Service on Arrest Warrants executed as to various

Defendants, ECF Nos. 122–28 (June 10, 2021). Given that the Government initiated the

prosecution of these Defendants well before their twenty-first birthdays, it cannot escape the

JDA simply by returning another superseding indictment on the eve of trial. *See U.S. v. Ramirez*,

297 F.3d 185, 190 (2d Cir. 2002) ("the applicability of the JDA is determined by the defendant's

age at the time of filing the juvenile information"); *United States v. Hoo*, 825 F.2d 667, 669 (2d

Cir. 1987) (holding that the JDA applies to "criminal proceedings that begin before the defendant

reaches the age of twenty-one"); *Wong*, 40 F.3d at 1367 ("This court has held that a defendant

can be held criminally liable for pre-eighteen conduct so long as the prosecution begins after the defendant is twenty-one years of age, thereby precluding application of the JDA.").

      *ii.*    *The Indictment*

Although Mr. Jones suggests that the Government "was required to charge a post-eighteen crime in order to establish jurisdiction[,]" Jones Mot. for Acquittal at 15, such a contention is not supported by the caselaw. Although the Second Circuit has not ruled definitively on the issue, it has suggested its unwillingness to require the prosecution to prove post-eighteen criminal behavior, in order to establish ratification. *See Geraldo*, 687 Fed. App'x at 108 (summary order) ("we are not prepared to assume that Vargas's continued membership in the criminal enterprise may only be established by the commission of additional crimes after reaching the age of majority"). And, the court has found evidence of flight to be sufficient to establish ratification, even absent charged post-eighteen criminal behavior. *United States v. Scott*, 681 F. App'x 89, 94 (2d Cir. 2017) (summary order), *abrogated on other grounds by United States v. Capers*, 20 F.4th 105 (2d Cir. 2021) (finding post-eighteen ratification based on evidence that a defendant fled during a traffic stop from a car driven by another member of the gang[2]).

      *iii.*    *The Verdict Form*

Mr. Donald's argument regarding the verdict form is similarly unpersuasive. In *Wong*, the Second Circuit premised its finding of ratification on the defendant's convictions for conspiracy to murder and extortion, both of which were committed after Mr. Wong's eighteenth birthday. *Wong*, 40 F.3d at 1366. Yet, the Second Circuit subsequently clarified that a jury need not find proof of ratification. *See Scott*, 681 F. App'x at 93 (while "[t]he *Wong* court relied on

---

[2] Post-conviction relief was later granted in part and denied in part, but not on the basis of ratification, by *Smith v. United States*, Case No. 18-cv-6917 (CJS), 2022 WL 1592157 (W.D.N.Y. May 19, 2022).

the jury's findings to satisfy the requirement [of ratification] . . . we did not there hold that a jury determination was required.").

Other circuits are split on the issue. *Compare United States v. Delatorre*, 157 F.3d 1205, 1209 (10th Cir. 1998) ("[A] jury may not convict an adult defendant solely on the basis of acts of juvenile delinquency . . . Instead, the jury must find post-majority conduct sufficient to establish that defendant participated in the conspiracy or racketeering enterprise after attaining the age of eighteen." (internal quotation marks omitted)); *United States v. Welch*, 15 F.3d 1202, 1212 (1st Cir. 1993) (endorsing an approach in which "there could be no conviction unless the jury found that appellants in some manner 'ratified' their participation in the conspiracy after attaining majority."); *and United States v. Thomas*, 114 F.3d 228, 266 (D.C. Cir. 1997) (because "it is the adult participation that gives the district court jurisdiction over the eighteen to twenty-one year old defendant, evidence of continued membership in the conspiracy must be predicated on the adult acts and the jury ordinarily must be so instructed."); *with United States v. Doerr*, 886 F.2d 944, 969–70 (7th Cir. 1989) ("once sufficient evidence has been introduced to allow a jury reasonably to conclude that a defendant's participation in a conspiracy continued after the defendant reached the age of eighteen, then the defendant may be tried as an adult."); *and Cruz*, 805 F.2d at 1476 (where the government made a threshold demonstration of post-eighteen conspiracy activity by "present[ing] evidence from which a jury could infer that [the defendant's] involvement in the conspiracy continued after he turned eighteen," the case "was properly within the jurisdiction of the district court.").

Notably, however, circuits requiring post-majority participation in the conspiracy to be found by the jury do not prefer nor require a special interrogatory on the topic of ratification. "[S]pecial interrogatories are generally disfavored in criminal cases," *United States v. Pierce*,

940 F.3d 817, 821 (2d Cir. 2019), although complex cases requiring a jury to find predicate facts may warrant their use, *United States v. Roman*, 870 F.2d 65, 73 (2d Cir. 1989), *cert. denied*, 490 U.S. 1109 (1989) ("[W]here the offense charged requires proof of a specific number of predicate facts and the nature of the proof at trial warrants it, the trial court would be well advised to submit to the jury interrogatories that would allow an assessment of whether the jury's determination of guilt rested on permissible bases."). The decision of whether to utilize special interrogatories is typically left to the discretion of the trial court. *United States v. Ogando*, 968 F.2d 146, 149 (2d Cir. 1992) ("Despite our stated preference for special interrogatories in particularly complex criminal cases, we have declined to delineate bright-line rules for determining when such interrogatories should be employed or in what form. . . . Rather, we commit the decision of whether and how to utilize special interrogatories in such cases to the broad discretion of the district court.").

In this case, the Court instructed the jury on the issue of ratification, provided the jury with the birth dates of each defendant, and stated: "In order to find Mr. Donald, Mr. Wright, or Mr. Jones guilty, you must first find that the government has proved beyond a reasonable doubt that each one participated in the furtherance of the conspiracy after turning 18." Nov. 30, 2023 Tr. at 145.[3] Although jurors were not asked to answer a question on the verdict form specifically

---

[3] The full jury instruction regarding ratification stated the following:

> A defendant who is under the age of 18 at the time he first became involved with a charged conspiracy may be charged as an adult by a federal court only if the government can prove that he ratified or continued his participation in the conspiracy after turning 18. Ratification does not require the defendant to have committed a predicate act after turning 18, but it does require a defendant to have participated in the charged enterprise after his 18th birthday. Continued involvement may be shown through admissions, interactions with co-conspirators, or other acts or statements demonstrating a defendant's continued involvement in and allegiance to the enterprise. However, a defendant's mere knowledge of or association with other members of the conspiracy is insufficient to prove membership in the conspiracy.

> Keishawn Donald was under 18 at the alleged start of the racketeering

about the issue of ratification, the instructions clearly stated that a finding of ratification, beyond

a reasonable doubt, was a necessary predicate to a guilty verdict on the RICO count.

The Court also notes that, during the charge conference, in which the Court provided an

opportunity for counsel to raise any issues related to the jury instructions or the verdict form, Mr.

Donald did not object to the lack of special interrogatory regarding ratification.

In light of the lack of applicable caselaw requiring a special interrogatory regarding

ratification, the Court's clear jury instructions on the subject, and Mr. Donald's failure to raise

this issue during the charge conference, the Court finds that the verdict form was not legally

insufficient.[4]

---

conspiracy. In order to find that he ratified his involvement in the conspiracy after turning 18, you must find that he continued his participation in the conspiracy after April 6, 2019.

Trevon Wright was under 18 at the alleged start of the racketeering conspiracy. In order to find that he ratified his involvement in the conspiracy after turning 18, you must find that he continued his participation in the conspiracy after November 30th of 2019.

Travon Jones was under 18 at the alleged start of the racketeering conspiracy. In order to find that he ratified his involvement in the conspiracy after turning 18, you must find that he continued his participation in the conspiracy after April 6, 2020.

Eric Hayes was 18 years old at the alleged start of the racketeering conspiracy in 2015, so this instruction does not apply to him.

In order to find Mr. Donald, Mr. Wright, or Mr. Jones guilty, you must first find that the government has proved beyond a reasonable doubt that each one participated in the furtherance of the conspiracy after turning 18.

[4] Mr. Donald also argues that because he faces a life sentence if considered an adult by ratification, but would not be eligible for a life sentence if he were a juvenile, under *Apprendi* the question of whether he ratified his involvement in the conspiracy after turning eighteen by continuing his participation in the conspiracy must be proved beyond a reasonable doubt. Donald Mot. at 6; *see also Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."). As discussed above, however, the Court specifically instructed the jury that "In order to find Mr. Donald, Mr. Wright, or Mr. Jones guilty, you must first find that the government has proved beyond a reasonable doubt that each one participated in the furtherance of the conspiracy after turning 18." Nov. 30, 2023 Tr. at 145. Accordingly, for the reasons discussed previously, there is no *Apprendi* issue present here. *See Apprendi*, 530 U.S. at 490 ("[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt." (quoting *Jones v. United States*, 526 U.S. 227, 252 (1999) (Stevens, J., concurring) and citing *Apprendi*, 530 U.S at 253) (alteration in original))

iv.    *Ratification*

Finally, both Mr. Donald and Mr. Jones argue that there was insufficient evidence for the jury to find beyond a reasonable doubt that they ratified their participation in the RICO conspiracy after turning eighteen. Donald Supp. Mot. at 23; Jones Mot. for Acquittal at 3.

The Court disagrees.

As the Government notes, it presented substantial evidence of both Defendants' ratification.

As to Mr. Donald, the most significant evidence of ratification related to the drive-by shooting of Joshua Gilbert on October 17, 2019.[5] Mr. Gilbert was shot out of the passenger side of a stolen gray Nissan Altima, which was observed fleeing from the scene. Nov. 15, 2023 Tr. at 162–63; Nov. 16, 2023 Tr. at 94. At the scene of the shooting, police recovered fourteen .40 caliber shell casings. Nov. 15, 2023 Tr. at 91. Police officers located the Altima on surveillance cameras and, several hours later, noticed that a white Oldsmobile had parked across the street from the Altima. *Id.* at 173; Nov. 16, 2023 Tr. at 62–63. Two individuals exited the Oldsmobile and approached the Altima. Nov. 16, 2023 Tr. at 63, 65–66. When law enforcement approached, the two individuals approaching the Altima, later identified as Zamir Hairston and Jordan Delgado, fled. *Id.* at 66–68. Police officers detained Mr. Donald and Mr. Jones in the Oldsmobile; both had firearms. *Id.* at 76–78, 81–82. Later, when law enforcement conducted forensic testing on the Altima, the profile from the driver's side interior door handle was consistent with Mr. Donald's DNA. Nov. 20, 2023 Tr. at 30. Mr. Donald, however, was eliminated as a contributor to the Glock .40 caliber gun used in the shooting, and the gun found on him that day did not match the shell casings found at the scene of the shooting. *Id.* at 35.

---

[5] The Government also introduced evidence of Mr. Jones's involvement in the Gilbert shooting. However, because Mr. Jones was under eighteen at on October 17, 2019, this evidence is not relevant to the question of ratification.

Mr. Donald argues that "[a]t most, Mr. Donald was arrested in a car that had driven two other individuals to pick up a stolen car that had been used in a shooting." Donald Supp. Mot. at 28. He argues that there was nothing to suggest that he was involved in the attempted shooting of Mr. Gilbert, and that, based on the evidence described above, "the government did not prove—and, in fact, could not prove—beyond a reasonable doubt that [he] affirmatively ratified his position in the RICO conspiracy charged at Count One." *Id.*

Mr. Donald's argument, however, is unpersuasive. To decide for Mr. Donald in his motion for acquittal, the Court must, "viewing the evidence in the light most favorable to the prosecution" determine that it is not possible for "*any* rational trier of fact [to] have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). Mr. Donald fails to meet this "heavy burden." *Si Lu Tian*, 339 F.3d at 150.

The Government presented evidence that Mr. Donald was arrested with East End gang members with firearms in his possession, was present with individuals picking up a stolen vehicle stolen vehicle used in a drive-by shooting of a rival gang member, and his DNA was found on the driver's side of that same vehicle. Even if there is some doubt that Mr. Donald shot at Mr. Gilbert because the gun found on him at the time of the arrest did not match the shell casing at the scene, viewing the evidence in the light most favorable to the Government, a rational juror could have found that Mr. Donald participated in the shooting in some way—even if he did not personally fire the weapon. *See Scott*, 681 F. App'x at 93 (finding that the defendant ratified participation after turning eighteen in part because he "fled during a traffic stop from a car driven by another gang member and containing a gun—an incident that resulted in his guilty plea to a charge of gun possession")

18

As to Mr. Jones, his continued targeting of rival gang members while in prison demonstrated his ratification of the conspiracy after turning eighteen.[6] On January 22, 2020, Mr. Jones assaulted Kirby Joseph. Nov. 27, 2023 Tr. at 40–41. Apart from disciplinary records documenting Mr. Jones's infractions for these assaults, East End gang member Charles Anthony Bonilla testified that Mr. Jones told him that he fought "Kirby from the Greenes." Nov. 20, 2023 at 157; *id.* ("Q. And you said he fought Kirby. Did you understand who Kirby was? A. Kirby Joseph from the Greenes."); *see also id.* at 90 ("Q. Now, what was the relationship between the East Side gang and the Greene Homes back then? A. Rivals.").

On April 8, 2020, in a recorded phone call, Mr. Jones stated that he and Tyron Moore are waiting for the arrival of rival gang member, Tyiese Warren. Nov. 28, 2023 Tr. at 84 ("Tyron and me, me and Tyron be waiting for -- waiting for Tyiese to come up here."); Nov. 20, 2023 Tr. at 133 (Mr. Bonilla testifies that Tyiese Warren was from Terrace); *id.* at 155 (During Mr. Bonilla's testimony, "Q. Why were you getting in fights with those people from the Terrace? A. Because I was repping the East End. Q. So what? A. Those are rival gang members."). At trial, Government presented evidence that, while he was a minor, Mr. Jones, together with Mr. Moore, killed Tyiese Warren's brother, Sean Warren. *See* Gov't Opp'n at 17–20. Five days after the indictment, on May 8, 2021, Mr. Jones assaulted Tyiese Warren. Nov. 27, 2023 Tr. at 38–39; Nov. 28, 2023 Tr. at 84.

---

[6] The Government also introduced evidence of Mr. Jones's assault of a rival gang member, Lorenzo Carter, on January 4, 2023. Nov. 27, 2023 Tr. at 51–54. As the Court has stated previously, however, acts in furtherance of the conspiracy committed before the date of the indictment on May 3, 2021 alone are not sufficient to establish ratification. Order, ECF No. 374 at 13 n.6 ("[T]o the extent that the Government intends to rely on a prison altercation that occurred in January 2023, this would not be sufficient because the relevant time period for ratification is the time period between when Mr. Jones turned eighteen and the date of the Indictment.").

On September 30, 2020, Mr. Jones was in a physical altercation with another rival gang member, Marcus Arriaga. Nov. 27, 2023 Tr. at 39; *see also* Nov. 20, 2023 Tr. at 75–76 (Mr. Bonilla testifies that Marcus Arriaga is from the "Greenes").

In addition, the Government played a recording of Mr. Jones's calls while he was incarcerated that indicate his continued loyalty to his prior associates. *See, e.g.,* GX 1132 (April 10, 2020 phone call where Mr. Jones states "Who you do it for? My hood, my city, my state, but really I do it for Racks and Scrap."); Nov. 28, 2023 Tr. at 85.

Accordingly, the Government presented evidence sufficient for a rational juror to conclude beyond a reasonable doubt that Mr. Donald and Mr. Jones ratified their participation in the charged conspiracy after turning eighteen.

### 2. Lack of In-Court Identification

Mr. Hayes argues that he should be acquitted of Count One because "based on the Government's failure to identify [him] in open court, there was insufficient evidence for the jury to convict [him] of the RICO conspiracy." Hayes Mot. at 6 (citing several cases—including *United States v. Weed*, 689 F.2d 752, 754 (7th Cir. 1982), *United States v. Green*, 757 F.2d 116 (7th Cir. 1985), and *United States v. Alexander*, 48 F.3d 1477 (9th Cir. 1995), *cert. denied*, 516 U.S. 878 (1995)—allegedly showing that an in-court identification of an accused is an essential element to establishing guilt beyond a reasonable doubt). Although some caselaw suggests that identity can be established by inference or circumstantial evidence, Mr. Hayes argues that, in this case, there was insufficient evidence from which a jury could make such an inference. Hayes Mot. at 6.

The Government responds that Mr. Hayes was identified multiple times throughout the trial, by his own lawyers (who introduced themselves as Eric Hayes's lawyers), as well as by

witnesses who identified him in various photographs throughout the course of trial. Gov't Opp'n at 56–57. Moreover, the Government contests Mr. Hayes's characterization of the caselaw, emphasizing that even the cases cited by Mr. Hayes "stand for the commonsense proposition that a defendant's identity 'can be inferred from all the facts and circumstances that are in evidence.'" *Id.* at 57 (citing *United States v. Weed*, 689 F.3d 752, 755 (7th Cir. 1982)).

The Court agrees.

Although "[i]dentification of the defendant as the person who committed the charged crime is always an essential element which the government must establish beyond a reasonable doubt[,]" an "in-court identification by a witness is not necessarily required." *Alexander*, 48 F.3d at 1491.

In each of the cases cited by Mr. Hayes, the court acknowledged that in-court identification was not necessary to establish the identity of the defendant, and found that, "[v]iewing the evidence in the light most favorable to the verdict, and crediting the government with all the inferences that can be drawn from the evidence," a rational trier of fact could have concluded that the defendant was the person who committed the crime without such an in-court identification. *Alexander*, 48 F.3d at 1490 (finding that an attorney's introduction identifying his client at trial, as well as the failure of a witness "to point out that the wrong man had been brought to trial[,]" can be sufficient proof of identity); *Green*, 757 F.2d at 119 (finding that, based on the defendant's failure to object to the introduction of stipulations referring to "the defendant in this case" or to the prosecution's references to "the defendant" throughout its case-in-chief, a jury could have logically inferred his identity); *Weed*, 689 F.2d at 755–56 (finding that, because none of the witnesses at trial noted that the defendant was not the person involved in the charged conduct, both defense counsel and the prosecution repeatedly referred to the

defendant at trial as the individual involved in the offense, and defense counsel failed to timely object to the lack of in-court identification during the trial, the lack of specific in-court identification did not mandate reversal of the defendant's conviction).

More recently, other circuits have followed suit. *See, e.g.*, *U.S. v. Bailey*, 598 F. App'x 117, 120–21 (3d Cir. 2015) (finding that, because neither defendant argued that they were not the person named in the indictment or that this was a case of mistaken identity, and because "the witnesses' answers to questions about each defendant contained responses that reasonably demonstrated that" they were referring to the defendants, the evidence was sufficient for a rational juror to find beyond a reasonable doubt that the defendants were the individuals involved in the alleged criminal behavior); *United States v. Ayala*, 289 F.3d 16, 25 (1st Cir. 2002) (finding that, because a witness identified the defendants in a photograph and defense counsel indicated that she was appearing on behalf of the defendants, "[t]he trial judge was therefore in a position to make the necessary identification finding based on a visual comparison of the photographs with the defendants in the courtroom"). And, although it has not yet ruled on this topic directly, the Second Circuit has upheld verdicts in the absence of an in-court identification. *See, e.g.*, *U.S. v. Bell*, 166 F.3d 1201, 1998 WL 777028, at *1 (2d Cir. 1998) (unpublished disposition) (finding that there was sufficient evidence to support a conviction, despite the lack of express in-court identification of the defendant, based on witnesses' use of "the defendant" and "William Bell" interchangeably to refer to the same person and defense counsel's failure to raise the issue of mistaken identity before, during, or after trial); *U.S. v. Taylor*, 562 F.2d 1345, 1358 (2d Cir. 1977) (allowing the jury to infer that the individual about whom a witness testified was the same person as the defendant, despite the lack of in-court identification).

In this case, Mr. Hayes's attorneys identified him by name. *See* Nov. 8, 2023 Tr. at 222 ("My name is Jon Schoenhorn. I'm one of Eric Hayes's lawyers."); Nov. 15, 2023 Tr. at 186 ("And when Mr. Hayes was arrested, he was found to be in possession of 2.7 grams of crack; is that correct? . . . And there was no firearm on Mr. Hayes?"). Additionally, multiple witnesses identified Mr. Hayes in photographs. *See, e.g.*, Nov. 13, 2023 Tr. at 148 (Tajie Hopkins identifying Mr. Hayes in GX 1152D); Nov. 6, 2023 Tr. at 6 (Kyran Dangerfield identifying Mr. Hayes in GX 532A). Taken together, these pieces of evidence were sufficient to enable the jury to conduct a visual comparison and conclude that Mr. Hayes was the person about whom witnesses were testifying. *See Ayala*, 289 F.3d at 25 (because a witness identified the defendants in a photograph and defense counsel indicated that she was appearing on behalf of the defendants, "[t]he trial judge was therefore in a position to make the necessary identification finding based on a visual comparison of the photographs with the defendants in the courtroom").

Accordingly, Mr. Hayes is not entitled to a judgment of acquittal based on the alleged lack of in-court identification.

### 3. The RICO Conspiracy

Mr. Donald, Mr. Hayes, and Mr. Jones have all argued that they are entitled to acquittal based on the insufficiency of the evidence as to various aspects of their involvement in the charged conspiracy.

Mr. Wright orally moved for acquittal, see ECF No. 555, but did not submit a written motion for acquittal. The Court will, however, consider his argument that he is innocent of the murder of Myreke Kenion submitted in his written motion for a new trial in this section. *See* Wright Mot. at 1–8.

"[A] defendant challenging the sufficiency of the evidence 'bears a heavy burden,' and 'the standard of review is exceedingly deferential.'" *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)). While "specious inferences are not indulged," *Lorenzo*, 534 F.3d at 159 (citation omitted), courts "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006) (citation omitted).

"Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor, but if the evidence, thus construed, suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt," the Court must defer to the jury. *Martinez,* 54 F.3d at 1042 (internal citations omitted). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Autuori*, 212 F.3d at 114 (alterations in original) (quoting *Guadagna*, 183 F.3d at 129).

The Court addresses the specific claims in greater detail in the following sections.

### i.    Existence of the RICO Conspiracy

Under 18 U.S.C. § 1962(d), it is "unlawful for any person to conspire to violate any of the provisions of [any subsection of the RICO statute]." "To establish a conspiracy claim pursuant to this statute, a 'plaintiff must establish as to each alleged co-conspirator: (1) an agreement to join the conspiracy; (2) the acts of each co-conspirator in furtherance of the conspiracy; [and] (3) that the co-conspirator knowingly participated in the same.'" *In re Trilegiant Corp., Inc.*, 11 F. Supp. 3d 82, 108 (D. Conn. 2014*), aff'd sub nom. Williams v. Affinion Grp., LLC*, 889 F.3d 116 (2d Cir. 2018) (citing *Valenti v. Penn. Mut. Life Ins. Co.*, 850

F. Supp. 2d 445, 450–451 (S.D.N.Y.2012), *aff'd*, 511 F. Appx. 57 (2d Cir.2013)) (alteration in original).

Mr. Donald and Mr. Hayes argue that the Government did not present sufficient evidence to prove the essential elements of a RICO conspiracy. Donald Supp. Mot. at 12; Hayes Mot. at 2. In particular, Mr. Hayes argues that, in order to sustain a conviction on the RICO Conspiracy count, the Government was required to prove the existence of an enterprise engaged in racketeering activity that affected interstate or foreign commerce, namely the East End gang, which, he contends, the Government failed to do. Hayes Mot. at 2–5 (citing 18 U.S.C. § 1962(c)). Mr. Donald acknowledges that proof of the existence of a racketeering enterprise is not required to sustain a conviction under 18 U.S.C. § 1962(d) but argues that such a requirement should exist. Donald Supp. Mot. at 12–13.

The Government argues that the conspiracy provision of the RICO Act "proscribes an agreement to conduct or to participate in the conduct of an enterprise's affairs through a pattern of racketeering activity." Gov't Opp'n at 35 (citing *United States v. Arrington*, 941 F.3d 24, 36 (2d Cir. 2019)). Proof of the existence of an enterprise and a pattern of racketeering activity is not required. *Id.* at 35–36. The Government argues that it nevertheless proved the existence of the East End gang through the testimony of East End gang members Kyran Dangerfield and Charles Anthony Bonilla, as well as opposition gang member Keith Jones, civilian witnesses, law enforcement officers, and gang expert Brian Fitzgerald. *Id.* at 43. The Government emphasized that the East End gang was a neighborhood-based entity with rivals (Original North End ("ONE") and Greene Homes Boyz ("GHB"), specific hand signs and vocabulary, and a leader. *Id.* at 43–44. East End members advertised their membership in social media posts, sold drugs together, and policed the boundaries of the gang's territory. *Id.* at 45–46. Finally, the

Government argues that at trial it proved that East End gang members agreed to commit and actually committed acts of violence against rival gang members, in order to enter and advance in status in the gang. *Id.* at 46.

The Court agrees.

"[T]he establishment of an enterprise is not an element of the RICO conspiracy offense." *United States v. Applins*, 637 F.3d 59, 75 (2d Cir. 2011); *see also Arrington*, 941 F.3d at 36 ("To prove a RICO conspiracy, the Government need not establish the existence of an enterprise."). Rather, the Government is required to prove only that "the defendant knew of, and agreed to, the general criminal objective of a jointly undertaken scheme." *Id.* at 36 (citing *Applins*, 637 F.3d at 75).

Thus, Mr. Donald and Mr. Hayes are not entitled to acquittal based on the Government's alleged failure to establish proof of the existence of the East End Gang, as this is not an element required to prove their underlying RICO offenses. *See Facen*, 812 F.3d at 286 ("A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." (alteration and internal quotation marks omitted) (quoting *Guadagna*, 183 F.3d at 130)).

Regardless, even if the existence of the East End Gang were an element that the Government must prove, a rational juror could find this fact beyond a reasonable doubt based on the evidence presented at trial. Gang expert, Brian Fitzgerald, provided testimony about the East End Gang, such as the area in which it operated and its affiliates and adversaries. Nov. 1, 2023 Tr. at 41 ("Q. And in your expert opinion, what were the names of the Bridgeport gangs between 2016 and 2023? A. . . . there was the East End gang[.]"); *id.* at 43 ("Q. And in your opinion, where in Bridgeport did the East End gang operate? A. The Stratford Avenue and Connecticut

Avenue corridor on the East End."); *id.* at 45 ("the East End gang members and the P.T. Barnum gang members were aligned and affiliated with each other and were adversaries of the Hollow, or the Greene Homes Boys, and the North End O.N.E."). In addition, Mr. Dangerfield testified that the East End Gang members would use particular hand signs and phrases. Nov. 3, 2023 Tr. at 218–20.

While Mr. Hayes suggests that "cooperators who testified were less than credible individuals" Hayes Mot. at 2, credibility determinations are to be made by the trier of fact. *Bala*, 236 F.3d at 93 (finding that courts must "defer to the jury's assessment of witness credibility").

Mr. Hayes contends that "[t]he East Enders who sold drugs did so for their own personal gain" and "the shootings that East Enders committed were individual acts of violence." Hayes Mot. at 5. This argument is unconvincing, however, as witnesses testified that only East End Gang members were permitted to sell drugs in the East End. Nov. 1, 2023 Tr. at 110 (Keith Jones, a member of the P.T. Barnum gang, testified that he could not sell drugs in the East End because "you would get killed"). In addition, the jury heard evidence that acts of violence would earn individuals respect from fellow East End Gang members. Nov. 3, 2023 Tr. at 218 ("Q. And how, if at all, was a gang member able to earn respect and kind of status within the gang? A. If you were the one, you know, out there, you know, shooting or getting the money.")

Accordingly, construing the evidence in the light most favorable to the Government, a rational juror could find a coordinated effort to engage in "racketeering activity that affected interstate or foreign conduct."

ii.    *Membership in the RICO Conspiracy*

Mr. Donald argues that the evidence at trial "did not establish beyond a reasonable doubt that Mr. Donald knowingly and voluntarily joined [a racketeering] scheme." Donald Supp. Mot. at 17. Mr. Donald also argues that there was insufficient evidence to establish beyond a reasonable doubt that he possessed, purchased, or sold narcotics. *Id.* at 19–20.

As the Government notes, however, it presented evidence at trial sufficient for a reasonable juror to conclude that Mr. Donald was a member of the East End Gang sold narcotics as a member of the East End Gang.

Mr. Dangerfield and Mr. Bonilla testified that Mr. Donald was a member of the East End Gang. Nov. 3, 2023 Tr. at 199–200; Nov. 20, 2023 Tr. at 62. Mr. Dangerfield also testified that he saw Mr. Donald sell "crack, [and] marijuana" Nov. 6, 2023 Tr. at 5; *see also* Nov. 3, 2023 Tr. at 230 ("Q. Who else, if anyone, in the East End gang sold drugs? A. Like Bookie, Keishawn, Heavyweight at times."). While, on cross-examination, Mr. Donald's trial counsel confronted Mr. Dangerfield with his grand jury testimony, where Mr. Dangerfield stated that he had "never seen [Mr. Donald] selling drugs," Nov. 6, 2023 Tr. at 124–25, as mentioned previously, the Court must defer to the jury's credibility determinations and "resolution of conflicting testimony" when reviewing a motion for acquittal. *Bala*, 236 F.3d at 93–94.

Regardless, Mr. Bonilla's testimony likewise suggested that Mr. Donald possessed, purchased or sold narcotics. In addition, the Government introduced Facebook messages between Mr. Bonilla and Mr. Donald. In his testimony, Mr. Bonilla testified that in the exchange he had asked Mr. Donald for Percocets, and Mr. Donald had asked "How many do you need?" Nov. 20, 2023 Tr. at 131.

Accordingly, there is sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Mr. Donald was knowingly and voluntarily a member of the East End Gang and sold narcotics as a member of the East End Gang.

### iii.    *Agreement to Commit Predicate Acts*

#### a.    Murder of Myreke Kenion

Mr. Wright argues that the weight of the evidence failed to prove beyond a reasonable doubt that he committed the murder of Myreke Kenion, and that "there is a real concern that [he] is innocent of the murder of Myreke Kenion." Wright Mot. at 8.

Myreke Kenion, a rival GHB gang member, was killed in a drive-by shooting while he was walking out of a convenience store near the Greene Homes housing projects. Nov. 16, 2023 Tr. at 162–63, 166, 168–69, 181–84. Video evidence from the store showed that the shots were fired out of a black Saturn Vue SUV. Nov. 17, 2023 Tr. at 29, 67. At the scene, police recovered shell casings from a 9-millimeter and .45 caliber firearm using Winchester ammunition. Nov. 16, 2023 Tr. at 184; Nov. 17, 2023 Tr. at 28, 79.  Police determined that the Saturn Vue was purchased by Taeron Womack. Nov. 17, 2023 Tr. at 73–74. Video surveillance showed that before and after the murder, the Saturn Vue picked up and dropped off passengers near 27 Cowles Street. *Id.* at 37–38; 41–42; 71–72, 75. Police executed a search warrant at the address, where they encountered Quasaan Minick and found a .45 caliber Winchester ammunition. *Id.* at 75–77.

Mr. Kenion was shot at approximately 5:37:50 p.m. Nov. 28, 2023 Tr. at 80. Evidence from Mr. Wright's phone shows no activity from 5:08 p.m. until 5:45 p.m. Nov. 2, 2023 Tr. at 48–49, 65. Less than ten minutes after Myreke Kenion was killed, Mr. Wright searched Mr. Kenion's Facebook profile. Nov. 28, 2023 Tr. at 80.

Mr. Dangerfield testified that Mr. Wright told him that he and Jaheim Warren shot Mr. Kenion, and Taeron Womack was driving. Nov. 6, 2023 Tr at 57–59. Mr. Warren also claimed that he and Mr. Wright committed the murder months later while Mr. Dangerfield was wearing a concealed recording device. *Id.* at 63 ("Q. And with regards to JD [Mr. Warren], what, if anything, did JD admit to you about shooting Myreke Kenion when you were wearing the wire? A. That -- that he did it and he said Tea'ron didn't stop the car for them, . . . him and Tre [Mr. Wright], you know, get out the car to, you know, do what they wanted to do.").

Despite this, Mr. Wright contends that a rational juror could not find him guilty beyond a reasonable doubt, because timestamps from the date of the murder show that he could not have been present at the drive-by shooting. Mr. Wright argues that, because his iPhone data indicates that at the time of the murder, his phone was within 65 meters of 45-51 Cowles Street, he could not have committed the murder of Mr. Kenion, which was "miles away" from this address. Wright Mot. at 2. He further argues that his Facebook post, "Racksssssssssss" at 5:45:59, which the Government argues is a reference to the Myreke Kenion shooting, further proves that "Mr. Wright was on Cowles Street not in the fleeing SUV." *Id.* at 2–3. Mr. Wright argues that he was with Lexus Cepeda sitting in a car parked outside 27 Cowles Street during the time of the murder. *See* Nov. 29, 2023 Tr. at 96–99 (Ms. Cepeda testifies that she was with Mr. Wright from around 3 or 4 p.m. until after the shooting had occurred).

In response, Government argues that "[Mr. Wright] made his timing argument to the jury and the jury rejected it[,]" and "a rational juror could—and indeed did—reasonably have credited the multiple other pieces of evidence that demonstrated Wright's guilt of the murder of Myreke Kenion." Gov't Opp'n at 63–64.

The Court agrees.

Evidence at trial suggested that the timestamp from videos used in surveillance video from the City of Bridgeport may not always correspond to the timestamp from iPhone data. *See* 11/2/23 Tr. at 147 ("Q: Are videos generally in the correct time? A: Usually not."). In addition, the Government showed a photograph of the car where Ms. Cepeda claimed she and Mr. Wright were at the time of the murder with no one inside and no lights on. Nov. 29, 2023 Tr. at 99–100.

Mr. Wright maintains that the timestamp evidence above supports Ms. Cepeda's testimony, and argues that one witness suggested that the iPhone time would be approximately the same. Wright Reply at 4–5; *see also* Nov. 3, 2023 Tr. at 70 ("Q: So as far as time, the exact time of day, the time on a City of Bridgeport pole camera and the time on an Apple iPhone should be exactly the same time to the second, right? A. Approximately, yes."). The Court, however, must "defer to the jury's assessment of witness credibility and . . . resolution of conflicting testimony." *Bala*, 236 F.3d at 93–94. Here, there is sufficient evidence for a rational juror to find beyond a reasonable doubt that Mr. Wright was present at the time of the shooting.

Accordingly, because it "is fairly possible" that Mr. Wright was present at the time of the shooting, the Court "must let the jury decide the matter," and reversal is not required. *See Guadagna*, 183 F.3d at 129 ("Rule 29(c) does not provide the trial court with the opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury. In fact, if the court concludes that either of the two results a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.") (citation and internal marks omitted).

   b.   Murder of Eric Heard

On January 30, 2018, Eric Heard, a member of the rival GHB gang, was shot and killed outside of 28 Price Street. Nov. 1, 2023 Tr. at 75. A witness, Jose Pizarro, heard a gunshot as he

was leaving JP Grocery, a store the intersection of Price and Palisade. Nov. 3, 2023 Tr. at 163–64. He then saw a person wearing a dark ski mask, a black hoodie, and blue jeans running across the intersection, and jump down a flight of stairs, falling on his knees. *Id.* at 162–65. No shell casings were recovered from the scene. *Id.* at 97. Ballistics testing indicated that Mr. Heard was shot with a .357 or .38 caliber bullet. *Id.* at 159.

Video surveillance showed an individual wearing a rolled up knitted cap, a dark jacket, and jeans, in the area around the time of the murder. Nov. 8, 2023 Tr. at 25–28, 33. The individual, later identified as Mr. Donald, then walked to Palisades Market store, holding something shiny in his right hand, that he placed in his pocket. Nov. 3, 2023 Tr at 127–28; Nov. 8, 2023 Tr. at 26–31. He then went to JP Grocery, where Eric Heard was making a purchase. Nov. 8, 2023 Tr. at 32, 34, 36–37; *see* Nov. 6, 2023 Tr. at 17 (Mr. Dangerfield identifying individuals as Mr. Heard and Mr. Donald). After Mr. Heard left, Mr. Donald went to the counter and left twelve seconds later without buying anything. Nov. 8, 2023 Tr. at 37–39. An individual matching Mr. Donald's description then walked in the same direction as Mr. Heard across Palisades Avenue, and then ran toward Mr. Heard on Price Street. Nov. 8, 2023 Tr. at 40–42, 44. Afterwards, the individual is seen running across the intersection, jumping down a flight of stairs, and falling on his hands. Nov. 8, 2023 Tr. at 44-46. The individual is then seen putting something back in their pocket. Nov. 8, 2023 Tr. at 47.

The police observed the individual enter 376 Remington Street, and executed a search warrant there. The police recovered a .32 revolver and a blue knit cap, which they concluded were unconnected to the shooting. Nov. 2, 2023 Tr. at 222; Nov. 3, 2023 Tr. at 17.  After the police searched Mr. Donald's residence, they found a black ski mask in his bedroom. Nov. 2, 2023 Tr. at 223; Nov. 8, 2023 at 18–19.

On January 31, 2018, Mr. Donald surrendered himself to juvenile detention for unrelated charges. During his intake a few days later, he was observed with abrasions on his right hand, right palm, and right forearm that Mr. Donald claimed were from playing basketball. Nov. 8, 2023 Tr. at 55; Nov. 28, 2023  Tr. at 95–96.

Although the parties stipulated that Mr. Donald surrendered himself to juvenile custody the day after the murder occurred, Mr. Dangerfield and Mr. Bonilla testified that shortly after the murder they met with Mr. Donald in person, and Mr. Donald admitted to killing Mr. Heard. Nov. 6, 2023 Tr. at 18 (Mr. Dangerfield testifies that Mr. Donald told him "maybe about a week or two after" the murder); Nov. 20, 2023 Tr. at 95–96 (Mr. Bonilla describes Mr. Donald showing him the gun Mr. Donald claimed he used to kill Mr. Heard "in the day or so after January 30, 2018").

Mr. Donald argues that Mr. Dangerfield and Mr. Bonilla's testimony that Mr. Donald admitted to the murders days afterwards were factually impossible, as Mr. Donald turned himself over to juvenile authorities the day after the murder on January 31, 2018. Donald Supp. Mot. at 21. He further argues that "without the testimony of Mr. Dangerfield and Mr. Bonilla" the Government's remaining evidence "did not establish beyond a reasonable doubt that Mr. Donald murdered Eric Heard on January 30, 2018." *Id.* at 22–23.

The Government contends that "the video evidence introduced at trial showed Donald in two stores immediately before the murder." Gov't Opp'n at 53. Moreover, the Government asserts "[t]hat Donald checked into a juvenile detention center the next day with avulsions on his hands and knees and still had some marks five days later provided a reasonable juror with ample reason to conclude that he had been present at the murder with a gun," and "[t]hat a black ski

mask with Donald's DNA was found at his home certainly provided even more reason to believe that the figure in the videos with the black ski mask was Donald." *Id.* at 53–54.

The Court agrees.

As an initial matter, while Mr. Donald claims that his admission to the murder to Mr. Dangerfield and Mr. Bonilla in the days after the murder were "factually impossible" because Mr. Donald was in juvenile custody, Donald Supp. Mot. at 21, the jury heard evidence that Mr. Donald admitted to the murder at other times in front of other East End Gang members while discussing "who did more" for the group. November 6, 2023 Tr. at 19–20; *see also* Nov. 20, 2023 Tr. at 66–67 (Mr. Bonilla testifies that Mr. Donald admitted to killing Eric Heard two years after the murder).

Even without Mr. Donald's admissions to Mr. Bonilla and Mr. Dangerfield, the remaining evidence was sufficient for a rational juror to conclude that Mr. Donald killed Eric Heard. Mr. Donald was identified as the individual wearing a knitted ski mask, dark shirt, and jeans in surveillance videos of stores nearby around the time of the murder. Nov. 3, 2023 Tr at 127–28 (Detective Leonard identifying Mr. Donald); Nov. 6, 2023 Tr. at 17 (Mr. Dangerfield identifying Mr. Donald). An individual matching that description was seen following Mr. Heard, then, after a gunshot was heard, running away and jumping down the stairs, and falling on his hands. Nov. 3, 2023 Tr. at 163–65; Nov. 8, 2023 Tr. at 40–46. Mr. Donald had scrapes on his hands and arms consistent with this fall days later. Nov. 8, 2023 Tr. at 55; Nov. 28, 2023  Tr. at 95–96.

Accordingly, the Government's evidence at trial, construed in the light most favorable to the Government, was sufficient for a reasonable juror to find that Mr. Donald committed the murder of Eric Heard beyond a reasonable doubt. *See Martinez,* 54 F.3d at 1042 ("if the

evidence, thus construed, suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt, then [the] conviction must stand.")

c.  <u>Shooting of Marquise Isreal</u>

On September 15, 2019, Marquise Isreal was shot approximately twelve times while at Flavorz restaurant with two women on the East End. Nov. 3, 2023 Tr. at 90; Nov. 15, 2023 Tr. at 28, 33–34, 55. Before the shooting, an individual in a mask was seen walking "back and forth" outside the restaurant. Nov. 15, 2023 Tr. at 30–31.

On September 25, 2019, Mr. Hayes was detained by the Bridgeport police and fled.  Nov. 15, 2023 Tr. at 148–149, 152–53. Officers observed Mr. Hayes remove a firearm from his waistband and throw it over his head on the top of a garage. Nov. 16, 2023 Tr. at 16–17. Police recovered the firearm. Nov. 15, 2023 Tr. at 155, 157, 159; Nov. 16, 2023 Tr. at 23. A ballistics expert concluded that the Kimber .45 caliber firearm recovered from Hayes during his arrest was the same weapon used to shoot Marquise Isreal. Nov. 27, 2023 Tr. at 105, 170– 172.

Mr. Dangerfield testified that the morning after the shooting, Mr. Hayes told him that he told Mr. Wright that Mr. Isreal was at Flavorz restaurant. Nov. 6, 2023 Tr. at 33–34. Mr. Dangerfield then testified that Mr. Wright affirmed that Mr. Hayes told him where Mr. Isreal was that day, and Mr. Wright shot Mr. Isreal with the same gun that was found on Mr. Hayes during his arrest. Nov. 6, 2023 Tr. at 34–35.

Mr. Hayes's cellmate at Cheshire Correctional Facility, Anthony Atkins, testified that Mr. Hayes told him that he shot Mr. Isreal "at a soul food restaurant." Nov. 9, 2023 Tr. at 83 (referring to Mr. Isreal by his alias, Garf). Mr. Atkins claimed that Mr. Hayes told him he "happened to see [Mr. Isreal] with two girls" and he "walked by just to make sure it was [Isreal]." *Id.* at 84. He claims that Mr. Hayes told him that "he had his hood on, and then he

35

walked back by, walked this way again, and then when he walked back that way again, that's when he opened the door and he said he shot him." *Id.* at 85.

Mr. Hayes argues that Mr. Dangerfield lied "when he testified that Mr. Hayes contacted [Mr.] Wright to shoot rival gang member Marquise Isreal" and Mr. Atkins' testimony is in direct contradiction with Mr. Dangerfield's testimony as well as assertions made by Mr. Wright's counsel at closing arguments that "Mr. Wright admits to shooting Isreal on September 15, 2019, and that he was the only one involved in the offense." Hayes Mot. at 6.

Mr. Hayes fails to show, however, that these alleged errors warrant reversal of his conviction. The jury is entrusted with evaluating the reliability of witnesses and resolving contradictions in the evidence, and thus the Court must defer to their credibility determinations in reviewing Mr. Hayes's motion for acquittal. *See Reifler*, 446 F.3d at 94 (Courts "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence") (internal citation and quotation marks omitted). In addition, to the extent Mr. Atkins' testimony contradicts statements made by Mr. Wright's attorney, as the Court instructed the jury, "arguments or statements by lawyers, either the defense or the government, are not evidence." Dec. 4, 2023 Tr. at 10. The jury, therefore, would have been right to disregard arguments made by Mr. Wright's attorney that contradicted a witness's testimony.

In any event, the jury heard other evidence connecting Mr. Hayes to the shooting— including his arrest with the gun used in the shooting ten days after the shooting—that a rational juror may use to conclude beyond a reasonable doubt that Mr. Hayes was involved in the shooting, whether as the shooter or an accomplice. *See* Nov. 27, 2023 Tr. at 105.

Accordingly, there is sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Mr. Hayes conspired to commit the shooting of Marquise Isreal. *See Martinez,* 54 F.3d at 1042 ("if the evidence, thus construed, suffices to convince any rational trier of fact of the defendant's guilt beyond a reasonable doubt, then [the] conviction must stand.")

### B.    Motions for a New Trial

Mr. Donald has moved, in the alternative, for a new trial under Rule 30 based on the grounds raised in his arguments for acquittal discussed above, as well as his contention that the Government offered false testimony at trial. Mr. Jones has filed a separate motion for a new trial alleging that the verdict form was deficient because he was entitled to a special verdict regarding the ratification issue and the Government violated his rights under the Confrontation Clause. Mr. Wright has filed a motion for a new trial and argues that (1) he is innocent of the murder of Myreke Kenion, (2) he was entitled to individual voir dire of prospective jurors, (3) and he was prejudiced by spillover evidence unrelated to him. In his reply, Mr. Wright also claims that the failure to include an alibi instruction and the Government's misstatement of fact in its rebuttal closing arguments warrants a new trial. ECF No. 628.

The Court will first address Mr. Donald's and Mr. Jones's arguments that are duplicative of their motions for acquittal, and then will address Mr. Jones's and Mr. Wright's remaining arguments in turn.

### 1.    Arguments Duplicative of the Motions for Acquittal

While, "[g]enerally, the trial court has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, . . . it nonetheless must exercise the Rule

33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *Ferguson*, 246 F.3d at

134 (quoting *Sanchez*, 969 F.2d at 1414). To grant the motion, "[t]here must be a real concern

that an innocent person may have been convicted." *Id.* (internal quotation marks omitted). And

"the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a

manifest injustice.'" *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (citing *United*

*States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)). Though when deciding a motion, this Court

must be satisfied that "competent, satisfactory and sufficient evidence in the record supports the

jury verdict." *Ferguson*, 246 F.3d at 134, "courts generally must defer to the jury's resolution of

conflicting evidence and assessment of witness credibility," only intruding in "exceptional

circumstances," such as when "testimony is 'patently incredible or defies physical realities.'" *Id.*

(quoting *Sanchez*, 969 F.2d at 1414).

Mr. Donald raises the arguments submitted in his motion for acquittal to contend that, in

the alternative, he is entitled to a new trial. Donald Mot. at 1. In particular, he argues that the

Government presented insufficient evidence of the existence of the East End Gang, his

involvement in the racketeering scheme, and the ratification of his participation in the RICO

conspiracy, and likewise failed to establish beyond a reasonable doubt that he committed the

murder of Eric Heard. *See* Donald Mot., Donald Supp. Mot. Moreover, Mr. Wright has argued

that that he is innocent of the murder of Myreke Kenion. Wright Mot. at 8. In addition, Mr. Jones

argues that he was entitled to a special verdict form regarding the ratification issue, Jones Mot.

for New Trial at 3, an issue that Mr. Donald also raised in his motion for acquittal. *See* Donald

Supp. Mot. at 1–2.

In response, the Government states that, as to Mr. Donald, the Government contends that

"[b]ased on the evidence described in connection with Keishawn Donald's motion for a

judgment of acquittal, there is no basis to find that the trial evidence preponderates heavily against the jury's verdict." Gov't Opp'n at 73. As to Mr. Wright, the Government argues that "a rational juror could—and indeed did—reasonably have credited the multiple other pieces of evidence that demonstrated Wright's guilt of the murder of Myreke Kenion." *Id.* at 63. As to Mr. Jones's and Mr. Donald's arguments that special verdict form was required, the Government contends that "the jurors were properly instructed on ratification" the absence of a special verdict form "was not error and certainly not an error warranting a new trial." Gov't Opp'n at 69; *see also* Gov't Opp'n to Supp. Mot. at 9–10.

The Court agrees.

The Court has considered the evidence supporting Mr. Wright's connection to the murder of Myreke Kenion, and Mr. Donald's arguments regarding the sufficiency of the evidence regarding the racketeering scheme and his participation therein, including the murder of Eric Heard, and found that the evidence was sufficient. *See supra*, Section III.A.3.iii.

As for Mr. Donald's and Mr. Jones's argument that they were entitled to a special verdict form on ratification, as discussed above, given that there is no binding authority requiring a special verdict form on the issue of ratification in this Circuit (or others), the Court's clear jury instructions on the subject, and the parties' failure to raise this argument at the charge conference, the Court has found that the verdict form was not legally insufficient. *See supra*, Section III.A.1.iii.

Accordingly, the Court finds that, for the reasons discussed above, the Defendants fail to demonstrate the "extraordinary circumstances" required to grant a motion for a new trial based on the arguments raised in their motions for acquittal. *Ferguson*, 246 F.3d at 134 ("[C]ourts generally must defer to the jury's resolution of conflicting evidence and assessment of witness

credibility," only intruding in "exceptional circumstances," such as when "testimony is 'patently incredible or defies physical realities.'") (citation and internal marks omitted).

2.  <u>False Testimony at Trial</u>

"In order to be granted a new trial on the ground that a witness committed perjury, the defendant must show that '(i) the witness actually committed perjury ...; (ii) the alleged perjury was material ...; (iii) the government knew or should have known of the perjury at [the] time of trial ...; and (iv) the perjured testimony remained undisclosed during trial. . . .'" *United States v. Josephberg*, 562 F.3d 478, 494 (2d Cir. 2009) (quoting *United States v. Zichettello*, 208 F.3d 72, 102 (2d Cir.2000) (alteration in original), *cert. denied*, 531 U.S. 1143 (2001). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001); *see also Josephberg*, 562 F.3d at 494 ("Differences in recollection do not constitute perjury"). "When such inconsistencies are revealed on cross-examination, it is for the jury to determine credibility." *United States v. Conner*s, 816 F. App'x 515, 520 (2d Cir. 2020) (citing *Josephberg*, 562 F.3d at 494).

Mr. Donald claims that, because the parties stipulated to the fact that Mr. Donald was not in Bridgeport in the days after the murder of Eric Heard, and prosecution witnesses Mr. Dangerfield and Mr. Bonilla testified that they met with Mr. Donald days after the murder of Eric Heard, the prosecution offered testimony that it knew was false that "was the only direct evidence of Mr. Donald's involvement in Eric Heard's murder." Donald Supp. Mot. at 29–30.

The Government contends that Mr. Bonilla and Mr. Dangerfield failed to "recollect the exact timing" of Mr. Donald's confession five years later at trial, and regardless the mistake is consequential because Mr. Bonilla and Mr. Dangerfield testified that Mr. Donald confessed several times afterwards, and Mr. Donald's trial counsel was able to point out to the jury the

impossibility of the timing of Mr. Donald's purported initial confession while cross-examining Mr. Dangerfield. Gov't Opp'n to Supp. Mot. at 4–6.

On reply, Mr. Donald contends that his trial counsel was ineffective for only cross-examining Mr. Dangerfield on the factual impossibility his cross-examination, and not confronting Mr. Bonilla. Donald Supp. Mot. Reply at 2. Mr. Donald likewise asserts that because Mr. Dangerfield and Mr. Bonilla testified about Mr. Donald's confession during a meeting with law enforcement on September 22, 2020 and before the grand jury on January 4, 2021, it is not sufficient to claim that the five years between the purported confession and the trial date explains the discrepancy. *Id.* at 2–3. Mr. Donald further argues that by relying on the factually impossible testimony on redirect and closing argument, the Government "deprive[d] Mr. Donald of his constitutional right to a fair trial by an impartial jury of his peers." *Id.* at 3–4.

The Court disagrees.

While inaccurate testimony about the precise date when Mr. Donald purportedly confessed to murdering Eric Heard arguably does not rise to the level of perjury, *see Monteleone*, 257 F.3d at 219 ("Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury."); *Josephberg*, 562 F.3d at 494 ("Differences in recollection do not constitute perjury"), even assuming that Mr. Donald is correct that Mr. Dangerfield and Mr. Bonilla committed perjury and the Government knew or should have known that they would give false testimony, any false testimony was subsequently disclosed to the jury on cross-examination.

In his cross-examination of Mr. Dangerfield, Mr. Donald's trial counsel pointed out that Mr. Donald surrendered himself to juvenile detention on January 31, 2018 and was there in the weeks afterwards. November 6, 2023 Tr. at 156 (Q. Well, the first time back in 2020, you said that this conversation between you and Keishawn Donald took place a month after the incident,

and then just earlier this year you said it happened a few days later, right? A. Yes. . . . Q. The problem is, Keishawn Donald surrendered himself to juvenile authorities on January 31st, 2018, didn't he? A. Correct. . . . Q. And six days later he was still there, correct? A. Correct. Q. And a couple of weeks after he surrendered, he was still in juvenile detention, correct? A. Correct.). Mr. Donald's trial counsel also noted inconsistencies in Mr. Dangerfield's recollection of when Mr. Donald initially confessed to killing Eric Heard and the impossibility of such a confession because Mr. Donald was in custody. *See id* at 157–158 (admitting to telling federal authorities in 2023 that the conversation occurred in July 2019 and that Mr. Donald was in juvenile detention at the time); *id.* at 160 (claiming in 2020 that the conversation occurred "about a month after the shooting").

While Mr. Donald argues that his counsel was ineffective in failing to elicit the same information in Mr. Bonilla's cross-examination, at the time of Mr. Bonilla's testimony on November 20, 2023, the jury had already been informed that Mr. Donald was in juvenile detention on January 31, 2018 from Mr. Dangerfield's cross-examination on November 6, 2023. In addition, before its deliberations, the jury was made aware that the parties had stipulated to this fact during closing arguments from Mr. Donald's counsel. Dec. 1, 2023 Tr. at 94 ("The problem is Keishawn Donald wasn't in Bridgeport in July 2019. How do we know that? We all stipulated to it. Keishawn Donald was not in Bridgeport, Connecticut for the month of July 2019. That's the agreement of the parties"). The Court likewise instructed the jury on the meaning of stipulation, Nov. 30, 2023 Tr. at 94 ("A stipulation is an agreement among the parties that a certain fact is true. You should regard such agreed facts as true"), and on the jury's duty to consider the credibility of witnesses. *Id.* at 100–02; *see id.* at 100 ("[Y]ou should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness

testified, and any other matter in evidence which may help you to decide the truth and
importance of each witness's testimony.").

Thus, not only was the allegedly perjured testimony disclosed, but also the jury
instructions mitigated impact of any such testimony. *United States v. Joyner*, 201 F.3d 61, 82 (2d
Cir. 2000), *decision clarified on denial of reh'g*, 313 F.3d 40 (2d Cir. 2002) ("Even if her
testimony was perjurious, however, cross-examination and jury instructions regarding witness
credibility will normally purge the taint of false testimony.") (citing *United States v. Blair*, 958
F.2d 26, 29 (2d Cir.1992)).

Additionally, Mr. Dangerfield and Mr. Bonilla testified to other occasions on which Mr.
Donald allegedly admitted to the murder of Eric Heard. Mr. Dangerfield testified that Mr.
Donald later told him and other East End gang members about killing Eric Heard, and had heard
him talk about the murder "about a handful of times." November 6, 2023 Tr. at 19–20.  Also, Mr.
Bonilla testified that Mr. Donald confessed to killing Eric Heard at the end of 2020 while they
both were incarcerated at Bridgeport County jail. Nov. 20, 2023 Tr. at 66–67 ("Q: When was –
when else did he tell you about killing [Eric Heard]? A: He talked about it all the time, but the
last time I could remember was when we was in Bridgeport County. Q: How many years after
January 30, 2018, was that? A: This was 2021 – 2020, the end of 2020."). As discussed above,
additional evidence supported the jury's verdict that Mr. Donald committed the murder of Eric
Heard. The jury, therefore, could have inferred that Mr. Donald admitted to the murder of Eric
Heard based on other testimony that is not factually impossible.

The alleged inaccuracy of some of the witnesses' testimony is not sufficient to displace
the jury's determination of the credibility of those witnesses and the weight of additional
evidence connecting Mr. Donald with the murder. *See Josephberg*, 562 F.3d at 494–95 ("It is the

task of the jury as the 'appropriate arbiter of the truth' to 'sift[ ] falsehoods from facts' and

determine whether an inconsistency in a witness's testimony represents intentionally false

testimony or instead has innocent provenance such as confusion, mistake, or faulty memory."

(quoting *Zichettello*, 208 F.3d at 102) (alteration in original)); *see also Blair*, 958 F.2d at 29

("We have always assumed, though never expressly held, that perjured testimony must have

remained undisclosed during trial in order to require reversal of a conviction. This position is

consistent with our long-held view that when perjury is introduced at trial, the subsequent

conviction is to be reversed only if there is reason to believe that the verdict was based on the

false testimony." (citations omitted)).

 Accordingly, Mr. Dangerfield's and Mr. Bonilla's testimony, even if partially or wholly

inaccurate, did not prejudice Mr. Donald's trial such that acquittal or a new trial is necessary. *See*

*id.* at 29 ("Blair's perjury was disclosed to the jury during trial, and the defense had ample

opportunity to rebut the testimony and undermine his credibility. The judge gave the jury

adequate instructions regarding its consideration of the perjured testimony. Even without Blair's

testimony, there was sufficient evidence to sustain the jury's verdict. We therefore conclude that

the introduction of the perjured testimony did not deprive Brown of a fair trial.")

### 3. Confrontation Clause

 The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the "right

... to be confronted with the witnesses against him." U.S. Const. amend VI.  In *Crawford v.*

*Washington*, 541 U.S. 36, 61–62 (2004), the Supreme Court established the rule that "an out-of-

court statement made by a declarant who does not testify at trial, where the statement is deemed

'testimonial,' is not admissible unless the declarant is unavailable and the defendant had a prior

opportunity to cross-examine the declarant concerning the statement." *United States v. Burden*,

600 F.3d 204, 223 (2d Cir. 2010). To determine if a statement is testimonial, courts use the "primary purpose test," which requires that "the statement, viewed objectively in light of all the relevant circumstances, was made or procured with a primary purpose of 'creating an out-of-court substitute for trial testimony.'" *United States v. Bick*, 711 F. App'x 664, 666 (2d Cir. 2017) (quoting *Ohio v. Clark*, 576 U.S. 237, 245 (2015)).

"Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). Business records may be testimonial, however, where they are "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and their "*sole purpose* was to provide prima facie evidence" in the defendant's trial. *Id.* at 311 (internal citation and quotation marks omitted).

Mr. Jones argues that the Government violated his rights under the Confrontation Clause through presenting evidence of his disciplinary records from the Connecticut Department of Correction. Jones Mot. for New Trial at 1–2. Mr. Jones asserts that his disciplinary reports "were unquestionably testimonial – they contained information that was obtained through the Department of Correction's investigation into an alleged rule violation, and were compiled for the purpose of documenting the alleged rule violation." Jones Mot. for New Trial at 2. Mr. Jones also claims that "[he] had no opportunity to cross-examine the declarants whose statements were contained in that evidence." *Id.* at 1

In response, the Government argues that "the disciplinary records were properly admitted as business records" and "are not testimonial." Gov't Opp'n at 67. The Government argues that

these records, "did not contain any description of events but merely the results of disciplinary proceedings and Travon Jones's convictions for fighting in prison and the names of the persons he fought." Gov't Opp'n at 67. In addition, the Government contends that "the later-in-time video evidence and testimony regarding Jones's instigation of a fight with a rival ONE member at the Donald W. Wyatt Detention Facility" provide additional evidence of Jones's ratification, and thus the admission of the disciplinary records was harmless. *Id.* at 68.

The Court agrees.

The disciplinary records, Government Exhibit 1156, simply indicate Mr. Jones's disciplinary infractions while he was incarcerated at the Connecticut Department of Correction. The custodian of the documents testified at trial that the records are kept and maintained in the ordinary course of business, Nov. 27, 2023 Tr. at 31, and there is no indication that the records were created solely for the purpose of providing evidence at Mr. Jones's federal trial. In fact, under Connecticut law, the Department of Correction is required to keep such records for reporting purposes. Conn. Gen. Stat. § 18-81t ("the Commissioner of Correction shall submit . . . a report containing: (1) The number of inmate disciplinary reports for each correctional facility filed during such calendar quarter; . . . ; (3) the number of inmate assaults on other inmates reported for each correctional facility during such calendar quarter").

Accordingly, the records are not testimonial statements that implicate the Confrontation Clause, and were properly admitted as business records. *See United States v. James*, 712 F.3d 79, 99 (2d Cir. 2013) (a business record "was not testimonial because it was not prepared primarily to create a record for use at a criminal trial"); *Owens v. Stirling*, 967 F.3d 396, 420 (4th Cir. 2020) (defendant's disciplinary records were not testimonial where they were "prepared in the ordinary course of the prison's business, pursuant to its obligation under state law").

To the extent Mr. Jones argues that any of the information contained within those records were hearsay within hearsay, these records—as the Government notes—did not form the "majority" of its proof of Jones's ratification. As discussed above, the Government presented other testimony and evidence of Jones's ratification, including testimony subject to cross-examination. *See supra*, Section III.A.1.iv. Moreover, while not relevant to the issue of ratification, the Government presented witnesses who testified regarding video evidence of Jones's fight with an alleged rival gang member in January 2023 while he was incarcerated at a federal facility after he had turned eighteen, and Mr. Jones's counsel was able to cross-examine the witnesses about the incident. *See* Nov. 27, 2023 Tr. at 50–69; 75–77.

### 4. Individual Voir Dire

"Voir dire is necessarily a matter in which the trial court has extremely broad discretion[,]" and "federal trial judges are not required to ask every question that counsel—even all counsel—believes is appropriate." *United States v. Lawes*, 292 F.3d 123, 128 (2d Cir. 2002). Courts "are reluctant to reverse a conviction solely because a particular question(s) was not asked on voir dire." *Id.* The Second Circuit has recognized three scenarios, however, that would be sufficient to warrant reversal:

> (i) a voir dire so demonstrably brief and lacking in substance as to afford counsel too little information even to draw any conclusions about a potential juror's general outlook, experience, communication skills, intelligence, or life-style
> (ii) a failure to inquire about, or warn against, a systematic or pervasive bias, including one that may be short-lived but existent at the time of trial, in the community that would have been cured by asking a question posed by a party
> (iii) a record viewed in its entirety suggesting a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking a requested voir dire question

*Id.* at 129.

For example, in *United States v. Nieves*, the Second Circuit found that failure to inquire about bias around people associated with gangs where the trial court "deliberately declined to mention that the case concerned gangs at all," implicated the second *Lawes* category—"a systemic or pervasive bias . . . in the community." 58 F.4th 623, 633 (2d Cir. 2023).

Mr. Wright argues that he should have been entitled to individual voir dire to ensure that each juror could remain fair and impartial despite Mr. Wright's admissions of committing other violent acts. Wright Mot. at 9–11.

In response, the Government argues that the Court's refusal to provide individual voir dire did not prejudice Mr. Wright because "when preliminary voir dire had completed, the Court allowed any lawyer to call back individually any venireperson, and allowed the lawyers to directly question the prospective juror." Gov't Opp'n at 70.

The Court agrees.

Given the extensive, two-day voir dire that consisted of over forty questions and where defense counsel and the Government were provided an opportunity to individually question prospective jurors, the first ground is inapplicable here. *See generally* Oct. 30, 2023 Tr. (first day of voir dire); Oct. 31, 2023 Tr. (second day of voir dire). Nor does this case implicate "systemic or pervasive bias . . . in the community." *Lawes*, 292 F.3d at 128 "A trial court can meet its baseline obligation to uncover bias by 'ask[ing] generalized questions about jurors' ability to serve impartially' after 'present[ing] sufficient context about the case for jurors' answers . . . to actually convey [pertinent] information.'" *Palin v. New York Times Co.*, 113 F.4th 245, 270 (2d Cir. 2024) (quoting *Nieves*, 58 F.4th at 639).

Here, prospective jurors were provided context about the case—including that the charges involved allegations of gang membership and activities undertaken on behalf of an

48

alleged gang—and were asked questions about general and specific biases they may have. *See e.g.*, Oct. 30, 2023 Tr. at 52 (Court providing summary of nature of the case); *id.* at 65 (asking about bias as to agencies and law enforcement); *id.* at 66 at (asking about bias as to cooperating witnesses); *id.* at 67 (asking about bias as to illegal narcotics); *id.* at 68 (asking about as to acts of violence); *id.* at 72 (asking about bias as to alleged crimes or race of defendants); *id.* at 72–73 ("Other than what has already been discussed, does anyone have any other views about the criminal justice system in the United States that might prevent you from being fair and impartial in hearing this case? Any other views that has [sic] not been raised before?"). As a result, only the third category is potentially applicable here.

But nothing in this "record viewed in its entirety suggest[ed] a substantial possibility that a jury misunderstood its duty to weigh certain evidence fairly that would have been clarified by asking" Mr. Wright's requested voir dire question: "Given the fact that Mr. Wright admits that he committed the violent criminal acts of shooting Marquis Israel [sic] numerous times on September 15, 2019 and admits that he committed the violent act of shooting Arvan Smith numerous times on December 8, 2019, will you still be able to be fair and impartial in deciding whether Mr. Wright murdered Myreke Kenion and attempted to murder D'Andre Brown on January 26, 2020?"

First, the Court's questions afforded the opportunity for counsel to identify prospective jurors who may not be able to remain fair and impartial. The Court specifically noted that the case involved acts of violence and provided prospective jurors the opportunity to identify any potential biases that would impair their ability to be fair and impartial. Oct. 30, 2023 Tr. at 68. ("This case also involves allegations of acts of violence, including assaults and murders. Does anyone have any views or life experiences with or regarding crimes of violence that might affect

your ability to judge the evidence fairly and impartially and render a verdict based solely on the evidence and the law as I will instruct you?").

Second, the Court asked prospective jurors if they would be able to follow the Court's instructions on the law. *See id.* at 72 ("Is there anyone who if they disagreed with the law or the jury instructions as I will provide them or thought the law should be interpreted differently might not be able to be fair and impartial in hearing and deciding this case?"). Then, the Court instructed jurors on the Defendant's presumption of innocence, and the Government's responsibility to prove guilt beyond a reasonable doubt. Nov. 30, 2023 Tr. at 91 ("The presumption of innocence was with Mr. Donald, Mr. Wright, Mr. Hayes, and Mr. Jones when the trial began, and it remains with them even as I speak to you now. I also instruct you that they shall be presumed by you to be innocent throughout your deliberations until such time, if ever, you as a jury are satisfied, after careful and impartial consideration of all of the evidence in the case, that the government has proven Mr. Donald, Mr. Wright, Mr. Hayes, and Mr. Jones to be guilty beyond a reasonable doubt. . . . [T]he burden is on the government to prove Mr. Donald's, Mr. Wright's, Mr. Hayes's, and Mr. Jones's guilt beyond a reasonable doubt. This burden never shifts to Mr. Donald, Mr. Wright, Mr. Hayes, and Mr. Jones . . . .").

Finally, Mr. Wright's counsel could and did question prospective jurors individually, and exercised that ability thoroughly. Mr. Wright's counsel individually questioned at least thirty-nine prospective jurors regarding any potential bias they may have around allegations of gang-related murders. *See* Oct. 30, 2023 Tr. at 91–92 ("This case involves a number of attempted murders, gang -- allegedly gang-related, and each one of the defendants is charged with a separate murder. So there is going to be four murders in this case and attempted murders. Just knowing that, does that make it so that you think you could be fair and impartial in the case or

based on your past experience that this might not be the case for you?"); *id.* at 100 ("As you heard, this case involves allegations of gang-related murders. Just knowing that, does that make it such that you might not be able to be fair and impartial, or do you think you could look at each individual that's charged and be fair and impartial?"); *id.* at 107 (same); *id.* at 122–23 (same); *id.* at 130–31 (same); *id.* at 138–23 (same); *id.* at 155 (same); *id.* at 174 (same); *id.* at 182 (same); *id.* at 192 (same); *id.* at 200–01 (same); *id.* at 205 (same); *id.* at 219 (same); *id.* at 225 (same); *id.* at 229 (same); *id.* at 232 (same); *id.* at 241 (same); *id.* at 244–45 (same); *id.* at 249 (same); *id.* at 254 (same); *id.* at 264–65 (same); *id.* at 268 (same); *id.* at 272 (same); *id.* at 285 (same); *id.* at 289 (same); *id.* at 300 (same); Oct. 31, 2023 Tr. at 72 (same); *id.* at 75 (same); *id.* at 84 (same); *id.* at 97 (same); *id.* at 100 (same); *id.* at 104 (same); *id.* at 114 (same); *id.* at 119 (same); *id.* at 122 (same); *id.* at 125 (same); *id.* at 132 (same); *id.* at 142 (same); *id.* at 493–94 (same). Mr. Wright's counsel also had an opportunity to voir dire individually all twelve total jurors empaneled and the four alternate jurors selected. *Compare* Oct. 30, 2023 Tr. at 304 (listing individual jurors who will be brought back for counsel to exercise peremptory challenges); Oct. 31, 2023 Tr. at 67–68 (same); *with* Oct. 31, 2023 Tr. at 189 (listing empaneled and alternate jurors). And the remaining jurors Mr. Wright's counsel did not have the opportunity to voir dire individually would have been brought back for such questioning, if Mr. Wright's counsel had asked. *See* Oct. 30, 2023 Tr. at 304 (Court: "So I'm going to give you the numbers of the people who in my view should be brought back for you all to exercise peremptory challenges. I won't go through all of the people who I'm removing for cause. If there is someone on that list you want to put back on, we can talk about that too, but I'm assuming the list I give you there may be other people you want to take off."); Oct. 31 Tr. at 67 (Court: "So here's my list of the folks that --

essentially I was going to bring everyone back but these numbers. So just tell me if there is someone you want back and we can bring them back.")

Thus, considering the record as a whole, Mr. Wright had been afforded "a full and fair opportunity to expose bias or prejudice on the part of the veniremen." *See United States v. Barnes*, 604 F.2d 121, 139 (2d Cir. 1979) (quoting *United States v. Robinson*, 475 F.2d 376, 380–81 (D.C.Cir.1973)), *cert. denied*, 446 U.S. 907 (1980); *id.* at 142 ("[T]here must be sufficient information elicited on Voir dire to permit a defendant to intelligently exercise not only his challenges for cause, but also his peremptory challenges[.]").

Accordingly, any alleged refusal to permit Mr. Wright's counsel to voir dire individually each juror on a specific question does not require reversal of his conviction. *See United States v. Tramunti*, 513 F.2d 1087, 1114 (2d Cir. 1975) ("In almost any case there can be developed a series of questions designed to uncover some possible juror prejudice, but the orderly functioning of the judicial process requires that the trial court be allotted some flexibility to place reasonable limitations on juror examination.").

### 5. The Spillover Effect

In *United States v. Ferguson*, the trial judge granted a new trial due to several errors, 49 F. Supp. 2d at 329–30, most specifically—for purposes of this case—because "[t]he jury was exposed to weeks of testimony regarding successful murders and assaults, none of which involved [the defendant]. The chance that this parade of violence unfairly prejudiced [the defendant's] right to a fair trial is just too great to ignore." *Id.* at 330. The Second Circuit has recognized that "*Ferguson* was an 'exceptional' case warranting a new trial." *United States v. Archer*, 977 F.3d 181, 189 (2d Cir. 2020). In affirming the district court's decision, the Second Circuit noted that due to the significant errors in the trial, "concerns about prejudicial spillover . .

. [were] moot." *Ferguson*, 246 F.3d at 137. As a result, *Ferguson* does not "stand[] for the proposition that this Court has ordered a new trial on the ground of retroactive misjoinder or prejudicial spillover simply because a jury found some counts unproven." *United States v. Hamilton*, 334 F.3d 170, 184 (2d Cir. 2003).

Instead, after *Ferguson*, the Second Circuit has recognized "[t]he concept of prejudicial spillover . . . [which] requires an assessment of the likelihood that the jury, in considering one particular count or defendant, was affected by evidence that was relevant only to a different count or defendant." *Hamilton*, 334 F.3d at 182. "A defendant bears an extremely heavy burden when claiming prejudicial spillover." *United States v. Griffith*, 284 F.3d 338, 351 (2d Cir. 2002). "The defendant must show that he or she suffered prejudice so substantial as to amount to a miscarriage of justice." *Id.* "[W]here the record indicates that the jury was able to distinguish between counts or between defendants, and to assess separately the evidence pertinent to each, [the Second Circuit has] found no basis for concluding that a new trial was warranted because of prejudicial spillover. The absence of such spillover is most readily inferable where the jury has convicted a defendant on some counts but not on others." *Hamilton*, 334 F.3d at 183.

Mr. Wright argues that evidence pertaining to other Defendants that is unrelated to his alleged actions caused a spillover effect that "stretche[d] the limits" of the jury's ability to be fair and impartial. Wright Mot. at 13–14 (citing *United States v. Ferguson*, 49 F. Supp. 2d 321 (S.D.N.Y. 1999), *aff'd*, 246 F.3d 129 (2d Cir. 2001))

The Government contends, however, that "to prove the existence of the enterprise, its manner and means and Wright's role within it, the Government was entitled to present evidence of all acts in furtherance and which showed the existence of the East End Gang, regardless of the particular RICO defendant who was on trial."

The Court agrees.

Here, although the jury heard evidence regarding violent acts from other defendants, the jury was instructed that they "may not infer that the defendants committed or, as to Mr. Wright and Mr. Jones, aided and abetted these crimes merely because they associated with other people who had a propensity to commit crimes or merely because you may believe these defendants have a propensity to commit crimes." Nov. 30, 2023 Tr. at 143. *See United States v. Villegas*, 899 F.2d 1324, 1348 (2d Cir. 1990), *cert. denied*, 498 U.S. 991 (1990); ("Given the nature of the case [a drug conspiracy], the evidence against these defendants, the instructions by the trial judge, and the questions of the jury, we find no merit in the claims of prejudicial spillover."). Notably, the jury did not turn a verdict for all of the murder-related charges, and found that Mr. Hayes did not murder Jerrell Gatewood as part of the RICO conspiracy. This is compelling evidence that the jury was able to "distinguish . . . between defendants, and to assess separately the evidence pertinent to each." *See Hamilton*, 334 F.3d at 183; *United States v. Stewart*, 433 F.3d 273, 310 (2d Cir. 2006) ("It is clear from the partial verdict of acquittal that the jury carefully evaluated the evidence and rendered a discriminating verdict and not one that was based on uncharged acts or bad character.").

In addition, as discussed above, the Government presented sufficient evidence for a rational juror to conclude beyond a reasonable doubt that Mr. Wright committed the murder of Myreke Kenion, including evidence discrediting Mr. Wright's alleged alibi. *See* Nov. 29, 2023 Tr. at 99–100; Nov. 6, 2023, Tr. at 57; *supra*, Section III.A.3.iii.a.

Accordingly, Mr. Wright has failed to show prejudicial spillover that warrants a new trial, particularly given the relevance of the East End Gang's alleged criminal activities in light of the racketeering charges present in this case. *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir.

1992) ("The evidence of the DeMeo Crew's various criminal activities was, therefore, relevant to the RICO charges against each appellant . . . because it tended to prove: (i) the existence and nature of the RICO enterprise and (ii) a pattern of racketeering activity on the part of each defendant by providing the requisite relationship and continuity of illegal activities."); *Griffith*, 284 F.3d at 351 ("A defendant bears an extremely heavy burden when claiming prejudicial spillover.").

### 6.   Alibi Jury Instruction and Misstatement of Facts

Mr. Wright also raises two additional arguments in his reply, namely that his counsel's "failure to request an alibi jury instruction prejudiced Mr. Wright in the jury's determination of the Myreke Kenion homicide" and the Government's misstatement of fact in its closing argument claiming that Mr. Wright admitted the Myreke Kenion murder to Mr. Dangerfield when they spoke on the phone on January 26, 2020. ECF No. 628 at 1, 4. While these arguments were not briefed in Mr. Wright's initial motion, the Court will nonetheless exercise its discretion to consider the merits of these arguments, given the severity of the crime with which Mr. Wright has been convicted. *See Booking v. Gen. Star Mgmt. Co.*, 254 F.3d 414, 418 (2d Cir. 2001) ("[W]e doubt that district courts lack all discretion to consider arguments raised for the first time in reply briefs—especially when, as here, they order additional briefing on the argument pressed in the reply brief.").

#### i.   *Alibi Jury Instruction*

In *United States v. Burse*, the Second Circuit reversed a defendant's conviction where "the court refused to give a jury instruction to the effect that, even if [the defendant's] alibi witnesses were disbelieved, the burden of proof remained with the government." 531 F.2d at 1152. The Second Circuit found this to be reversible error because "[i]n those cases where an

alibi defense is presented, there exists the danger that the failure to prove that defense will be taken by the jury as a sign of the defendant's guilt." *Id.* at 1153. Likewise, in *United States v. Zuniga*, the Ninth Circuit reversed the defendant's conviction based on the trial court's refusal to provide an alibi instruction, and noted that "[a]n alibi instruction is critical because a juror, unschooled in the law's intricacies, may interpret a failure to prove the alibi defense as proof of the defendant's guilt." 6 F.3d at 570. In *Burse*, however, the Second Circuit noted that "[w]hen such an instruction has not been requested or when the evidence of the defendant's guilt has been overwhelming or when the evidence in support of the alibi defense has been negligible or when the defendant's presence at the scene of the crime has not been an element of the offense which the government was required to prove, the courts have held that failure to provide an alibi instruction does not require reversal[,]" without taking a view as to the propriety of such decisions. *Burse*, 531 F.2d at 1153.

After *Burse*, the Second Circuit has clarified that where the defendant is charged with conspiracy, an alibi instruction is not in error where it did not exonerate the defendant, but merely established that the defendant might not have participated in one of several overt acts of the conspiracy. *United States v. Guillette*, 547 F.2d 743, 751–52 (2d Cir. 1976), *cert. denied*, 434 U.S. 839 (1977) ("[S]ince the offense charged was conspiracy, the government was not required to prove appellants' attendance at the May 8 meeting beyond a reasonable doubt and thus the trial court did not err in refusing to so instruct the jury. The alibi, if believed by the jury, established no more than that appellants did not participate in one of numerous overt acts of the conspiracy."); *United States v. Thomas*, 34 F.3d 44, 50 (2d Cir. 1994) ("Because [defendant's] 'evidence' was not inconsistent with his guilt, there was no error in [trial judge's] refusal to give an alibi charge."); *United States v. Bryser*, 954 F.2d 79, 87 (2d Cir. 1992) ("[T]here was no basis

for an alibi instruction because an alibi covering the time of the theft is no defense to crucial charges in the indictment. Specifically, the government did not have to prove that [Defendants] were present . . . in order for the jury to convict the defendants of *conspiring* to commit [acts related to conspiracy]." (emphasis in original)).

Mr. Wright cites *United States v. Burse*, 531 F. 2d 1151 (2nd Cir. 1976) and *United States v. Zuniga*, 6 F.3d. 569, 570 (9th Cir. 1993) for the proposition that, because "[t]he jury in Mr. Wright's case was not instructed that failure to establish an alibi defense is not evidence of guilt," they may have "discredited Lexus Cepeda's testimony and based on that, improperly used Cepeda's lack of credibility as evidence of guilt." ECF No. 628 at 3. Mr. Wright claims that the absence of an alibi instruction, therefore, entitles him to a new trial.

The Court disagrees.

Because Mr. Wright was charged under 18 U.S.C. § 1962(d), as opposed to a substantive RICO count under 18 U.S.C. § 1962(c), the Government need not prove beyond a reasonable doubt that he shot Myreke Kenion. Rather, it need only prove that he conspired to commit overt acts in furtherance of the RICO conspiracy. *See* Second Superseding Indictment; *United States v. Capers*, 20 F.4th 105, 121 (2d Cir. 2021) (Defendant's conviction of a conspiracy under § 1962(d) "required proof beyond a reasonable doubt only that [defendant] and others agreed to do those things, not that [defendant] (or anyone else, for that matter) ever actually committed those crimes."). Here, unlike *Burse*, the jury could have found Mr. Wright guilty of Count One, even if the jury had concluded that Mr. Wright was not involved in the murder of Myreke Kenion because Mr. Wright admitted his involvement in at least two other predicate acts of targeting rival gang members—the murder of Arvan Smith and shooting of Marquis Isreal. Nov. 6, 2023 Tr. at 201–02.

Accordingly, because Mr. Wright would not have been exonerated of the conspiracy if the jury had credited his alibi defense for one of several overt acts, the failure to instruct the jury on an alibi defense is not "a manifest injustice" requiring reversal. *See Ferguson*, 246 F.3d at 134 ("The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice.  The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict." (citation and internal quotation omitted)).

In addition, the lack of an alibi instruction did not unfairly prejudice Mr. Wright in the jury's determination that, in addition to being guilty of Count One, he had likewise been involved in the murder of Myreke Kenion. As discussed above, there is sufficient evidence for a rational juror to conclude that Mr. Wright was, at least, involved in the murder, discrediting Mr. Wright's alibi defense. *See supra*, Section III.A.3.iii.a.

The Government presented a witness who testified that Mr. Wright admitted to the murder, a recording where Mr. Jaheim Warren claimed he committed the murder with Mr. Wright, as well as evidence from Mr. Wright's social media page consistent with his involvement in the shooting. Nov. 6, 2023 Tr at 57–58 (Q. And what, if anything, did he [Mr. Wright] tell you later about the murder? A. That him and JD was the shooters. Q. And what, if anything, did he tell you about who else they were with? A. He said that Tae'ron was driving.); *Id.* at 61–62 (Q. And with regards to JD [Mr. Warren], what, if anything, did JD admit to you about shooting Myreke Kenion when you were wearing the wire? A. That -- that he did it and he said Tea'ron didn't stop the car for them, . . . him and Tre [Mr. Wright], you know, get out the car to, you know, do what they wanted to do); Nov. 28, 2023 Tr. at 80 (Q. And what is Mr. Wright searching for? A. SG Reke. Q. Who is that? A. The Facebook for Myreke Kenion.). Though a witness testified to being with Mr. Wright in a car at the time of the shooting, the

Government showed a photo of the car, at the relevant time, allegedly empty, and with the engine turned off on a cold night. Nov. 29, 2023 Tr. at 99–100. As a result, all of the evidence presented at trial, notwithstanding Mr. Wright's alibi defense, mitigates against reversal.

Finally, the Second Circuit has found, in the context of a state habeas claim, that where counsel requested an alibi instruction but did not provide proposed language and did not object to the Court's proposed charge that misstated the law, the error did not warrant granting habeas relief. *Wright v. Smith*, 569 F.2d 1188, 1192–94 (2d Cir. 1978) ( "Petitioner's burden . . . is particularly heavy for the reason . . . defense counsel neither submitted a proposed alibi charge to the trial court nor objected to the instruction that was given. . . . Viewing the charge as a whole in the light of the trial record, . . .we are satisfied that, regardless whether certain portions might, standing alone, constitute error as a matter of state law, the flaws fell far short of plain error and did not reach a constitutional level warranting issuance of a writ of habeas corpus.").

Here, Mr. Wright's counsel does not dispute that he failed to request a jury instruction on alibi defense. Rather, he claims that he was ineffective for the failure to do so. Wright Mot. at 2. The jury was instructed, however, on the Government's burden to prove guilt beyond a reasonable doubt. *See* Dec. 4, 2023 Tr. at 10–12. Considering that the Court did not deny a request for an alibi instruction, and the jury's proper instruction about the Government's burden, failure to include alibi instruction does not warrant reversal.

Accordingly, because there is "competent, satisfactory and sufficient evidence in the record [to] support[] the jury verdict," *Ferguson,* 246 F.3d at 134 (citation and internal quotation marks omitted)), and Mr. Wright did not request a jury instruction on the alibi defense, the failure to provide an alibi charge does not warrant a new trial.

### ii.    Government's Misstatement of Fact

"In determining whether a prosecutor's statements require reversal, '[t]he test is whether the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial.'" *United States v. Pena*, 793 F.2d 486, 490 (2d Cir. 1986) (quoting *United States v. Wilkinson*, 754 F.2d 1427, 1435 (2d Cir.)). "This determination depends heavily on the context of the case, and is largely controlled by three factors: (1) the severity of the misconduct; (2) curative measures taken by the district court; and (3) the certainty of conviction absent the misconduct." *United States v. LaMorte*, 950 F.2d 80, 83 (2d Cir.1991) (internal citations omitted). "In the particular context of closing arguments, '[c]ounsel are entitled to broad latitude in the inferences they may suggest to the jury in summation,' and 'are free to make arguments which may be reasonably inferred from the evidence presented.'" *United States v. Jones*, 129 F.3d 114, 1997 WL 722938 (2d Cir. 1997) (unpublished disposition) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 807 (2d Cir.1990)) (alteration in original).

Mr. Wright argues that the Government made a "critical" misstatement in its rebuttal argument that entitles him to a new trial— that Mr. Wright "admit[ted] to the Myreke Kenion murder to Mr. Dangerfield when they spoke on the phone on January 26, 2020, soon after the shooting."

The Court disagrees.

At trial, Mr. Dangerfield testified that, after the January 26, 2020 shooting, Mr. Wright told him that he and Jaheim Warren ("JD") conspired to murder Myreke Kenion. Nov. 6, 2023, Tr. at 57 (Q. And what, if anything, did [Mr. Wright] tell you later about the murder? A. That him and JD was the shooters.). Mr. Dangerfield did not testify, however, that the conversation occurred on the night of January 26, 2020. *Id.* (Q. Did you ultimately talk to Tre that evening? A.

Yes. Q. And what, if anything, did he tell you about the murder? A. He didn't tell me anything at that time. He just -- he just say he was trying to get high.)

Mr. Wright's counsel orally raised this issue during a sidebar at closing arguments. Dec. 1, 2023 Tr. at 234. After reviewing transcripts of Mr. Dangerfield's testimony and the Government's closing, the Court noted that the alleged error relates to the timing of Mr. Wright's admission of committing the murder to Mr. Dangerfield—i.e., whether that admission took place the night of January 26, 2020, not whether any such admission ever occurred. Dec. 4, 2023 Tr. at 4. The Court doubted that this was "enough of a difference to warrant a mistrial or further instruction," *id.*, but nonetheless repeated three instructions to the jury, reminding them that arguments and statements made by the Government and defense lawyers are not evidence, that they are the sole judges of witnesses' credibility, and that defendants have no obligation to testify and the government bears the burden of proving a defendant's guilt beyond a reasonable doubt.[7] *See* Dec. 4, 2023 Tr. at 10–12.

---

[7] The full jury instruction stated the following:

> First, arguments or statements by lawyers, either the defense or the government, are not evidence.

> Second, it must be clear to you by now that you are being called upon to resolve various factual issues. You now will have to decide where the truth lies, and an important part of that decision will involve making judgments about the testimony of the witnesses you have listened to and observed.

> In making those judgments, you should carefully scrutinize all of the testimony of each witness, the circumstances under which each witness testified, and any other matter in evidence which may help you decide the truth and the importance of each witness's testimony.

> You have had an opportunity to observe all of the witnesses. It is now your job to decide how credible each witness was in his or her testimony. You are the sole judges of the credibility of each witness and of the importance of his or her testimony.

> Third -- and again, these are all just actually almost verbatim from earlier instructions. I'm just reiterating them.

> Third, the defendants did not testify in this case. Under our Constitution, a defendant has no obligation to testify or to present any evidence in his defense because it is the government's burden to prove his guilt beyond a reasonable

Here, the Government, at best, misstated the timing of when Mr. Wright admitted to Mr. Dangerfield that he committed the murder of Myreke Kenion during their closing arguments. This misstatement does not amount to severe misconduct. Moreover, the Court took curative measures. After closing arguments, the Court reminded the jury that statements made by attorneys are not evidence, and of their role as sole factfinder and the Government's burden to prove guilt beyond a reasonable doubt. *See generally* Dec. 4, 2023 Tr. at 10–12; *see also id.* at 10 ("arguments or statements by lawyers, either the defense or the government, are not evidence."); *id.* at 11 ("Under our Constitution, a defendant has no obligation to testify or to present any evidence in his defense because it is the government's burden to prove his guilt beyond a reasonable doubt. That burden remains with the government throughout the entire trial and never shifts to the defendants."). Finally, it is doubtful that this statement impacted jury's verdict. Mr. Dangerfield testified that Mr. Wright did, at some point after the murder, tell him that he shot Myreke Kenion along with Mr. Jaheim Warren, and Mr. Warren corroborated this while Mr. Dangerfield was wearing a concealed recording device. *See* Nov. 6, 2023, Tr. at 57 (Q. And what, if anything, did [Mr. Wright] tell you later about the murder? A. That him and JD was the shooters); *id.* at 61 (Q. And with regards to JD [Mr. Warren], what, if anything, did JD admit to you about shooting Myreke Kenion when you were wearing the wire? A. That -- that he did it

---

doubt. That burden remains with the government throughout the entire trial and never shifts to the defendants.

A defendant is never required to prove that he is innocent. You may attach no significance to the fact that the defendants did not testify. You are not to speculate as to why they did not testify or about what they might have said if they had elected to testify. No adverse inference may be drawn by you because they did not take the witness stand. You may not consider this against the defendants in any way in your deliberations in the jury room. You are to confine your deliberations exclusively to the question of whether or not on the evidence actually before you the government has established their guilt beyond a reasonable doubt.

Dec. 4, 2023 Tr. at 10–12.

and he said Tea'ron didn't stop the car for them, . . . him and Tre [Mr. Wright], you know, get out the car to, you know, do what they wanted to do.). Moreover, the jury heard other evidence that Mr. Wright's social media posts on January 26, 2020 suggest his involvement in the murder; so, any misstatement regarding the timing of Mr. Wright's admission to Mr. Dangerfield was not unduly prejudicial. *See supra*, Section III.A.3.iii.a.

Accordingly, this single misstatement made at rebuttal closing arguments at the end of a several week trial did not compromise the integrity of Mr. Wright's trial. *See United States v. Tutino*, 883 F.2d 1125, 1136 (2d Cir. 1989) ("[T]he likelihood that any prejudice resulted from this solitary remark is extremely remote. The remark came after two days of summations at the very end of a trial that spanned seven weeks. The risk of influencing the jury through one inappropriate remark was therefore minimal. . . . In addition, the curative instructions that were given both immediately and moments later were sufficient to eliminate any possible prejudice from the prosecutor's remarks.").

## IV.    CONCLUSION

For the foregoing reasons, the Court **DENIES** the Defendants' motions for acquittal, as well as their motions for a new trial.

**SO ORDERED** at New Haven, Connecticut this 8th day of November, 2024.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE